ASSESSORS OF BOSTON *vs.* COMMISSIONER OF CORPO-
RATIONS AND TAXATION & another
(and eleven other cases [1]).

Suffolk.  December 9, 10, 1948. — February 14, 1949.

Present: QUA, C.J., LUMMUS, RONAN, SPALDING, & WILLIAMS, JJ.

*Taxation,* Manufacturing corporation; Personal property tax: machin-
ery, exemption.  *Corporation,* Manufacturing corporation.  *Words,*
"Manufacturing."

The word "manufacturing," as used in § 38C and in § 42B of G. L. (Ter.
Ed.) c. 63, as appearing respectively in § 1 and in § 2 of St. 1937,
c. 383, has no technical meaning.
In determining as a fact whether certain domestic and foreign corpora-
tions were manufacturing corporations so that the machinery used by
them was exempt from local taxation under G. L. (Ter. Ed.) c. 63,
§ 38C and § 42B, as appearing respectively in § 1 and in § 2 of St.
1937, c. 383, those statutes must be fairly construed and reasonably
applied so as to effectuate the intent of the General Court in enacting
them, namely, to promote the general welfare of the Commonwealth
by inducing new industries to locate here and to foster the expansion
and development of our own industries, so that the production of
goods shall be stimulated, steady employment afforded to our citizens,
and a large measure of prosperity obtained.
The mere fact that a finished product has the same name as the raw
material is not decisive in determining whether a corporation producing
it is a manufacturing corporation within § 38C or § 42B of G. L. (Ter.
Ed.) c. 63, as appearing respectively in § 1 and in § 2 of St. 1937, c. 383.
That the manufacturing part of the business of a corporation is not
nearly so profitable as its nonmanufacturing part is not decisive of
its classification under § 38C or § 42B of G. L. (Ter. Ed.) c. 63, as
appearing respectively in § 1 and in § 2 of St. 1937, c. 383.
To be a manufacturing corporation whose machinery is exempt from local
taxation under § 38C or § 42B of G. L. (Ter. Ed.) c. 63, as appearing
respectively in § 1 and in § 2 of St. 1937, c. 383, it need not be wholly

---

[1] The other eleven appeals are by the assessors of Boston against the com-
missioner of corporations and taxation.  In each of these twelve appeals
there is an intervener, and they are, respectively, as follows: Dwinell-Wright
Company, LaTouraine Coffee Co., Stanley W. Ferguson, Inc., Standard
Brands Incorporated, Orange Food Products, Inc., American Dry Ginger
Ale Company, Incorporated, Coca-Cola Bottling Company of Boston, Whiting
Milk Company, Merchants Wool Scouring Company, Pittsburgh Plate Glass
Company, Carter, Rice and Company Corporation, and Boston Mailing
Company.

or principally engaged in manufacturing; it is enough that the manufacturing part of its business is important and material when considered in the light of its entire business.

The exemption of the machinery of a manufacturing corporation from local taxation granted by § 38C and by § 42B of G. L. (Ter. Ed.) c. 63, as appearing respectively in § 1 and in § 2 of St. 1937, c. 383, is of all its machinery, not only of its machinery actually used in manufacturing.

The mere fact that a process leading toward the manufacture of a completed article is performed by a corporation as an independent contractor is not determinative of the question whether it is a manufacturing corporation entitled to have its machinery exempt from local taxation under § 38C or § 42B of G. L. (Ter. Ed.) c. 63, as appearing respectively in § 1 and in § 2 of St. 1937, c. 383.

That the form and nature of a material partly wrought still continued to be of the original material was not decisive that, when further processed, it did not become a manufactured product so that a corporation processing it was a manufacturing corporation under § 38C or § 42B of G. L. (Ter. Ed.) c. 63, as appearing respectively in § 1 and in § 2 of St. 1937, c. 383, if the product when finished had been changed into a new article designed for a particular use.

The Appellate Tax Board rightly decided that certain domestic and foreign corporations were manufacturing corporations whose machinery was exempt from local taxation under either § 38C or § 42B of G. L. (Ter. Ed.) c. 63, as appearing respectively in § 1 and in § 2 of St. 1937, c. 383, where it appeared from agreed facts that they were engaged in processes of manufacture, respectively, in changing raw coffee beans into marketable coffee; in producing soft drinks; in making fruit syrups and shredded fruit peel products; in making a chocolate milk beverage, ice cream mix, and soft cheese from milk; in scouring raw wool by various processes so that it became a product usable in making cloth; in processing glass, manufactured outside the Commonwealth, into various usable forms; in processing paper through various forms into new articles for particular uses; and in cutting, arranging, stapling, stitching and covering printed sheets to form pamphlets, books and magazines.

APPEALS from decisions of the Appellate Tax Board.

*W. H. Kerr*, (*W. A. McDermott*, Assistant Corporation Counsel, with him,) for Assessors of Boston.

*R. W. Cutler, Jr.*, Assistant Attorney General, for the Commissioner of Corporations and Taxation.

*F. M. Ives*, (*F. H. Perry* with him,) for Dwinell-Wright Company.

*A. L. Hyland*, for LaTouraine Coffee Co. and another.

*G. B. Rowlings*, for Orange Food Products, Inc., and another.

*J. T. Noonan,* (*H. V. Atherton* with him,) for Coca-Cola Bottling Company of Boston.

*E. L. Twomey,* for Whiting Milk Company.

*J. P. Graham,* (*W. F. A. Graham* & *T. J. Donoghue* with him,) for Merchants Wool Scouring Company and another.

*R. W. Meserve,* for Carter, Rice and Company Corporation.

*J. Hunt,* for Boston Mailing Company.

No argument nor brief for American Dry Ginger Ale Company, Incorporated.

RONAN, J. These are twelve appeals by the board of assessors of Boston from decisions of the Appellate Tax Board. The commissioner of corporations and taxation, acting under G. L. (Ter. Ed.) c. 58, § 2, as most recently amended by St. 1941, c. 726, § 2, prepared and submitted on April 17, 1947, to the board of assessors a list of corporations known to him to be liable on January 1, 1947, to taxation under G. L. (Ter. Ed.) cc. 59, 60A and 63, in which list he classified as manufacturing corporations the twelve corporations hereinafter mentioned. The commissioner having failed to act within twenty days upon applications of the board of assessors filed with him on May 15, 1947, seeking a change in the classification of these twelve corporations on the ground that they were business but not manufacturing corporations, the board of assessors on June 20, 1947, appealed to the Appellate Tax Board. Each of these corporations was allowed to intervene by the Appellate Tax Board in the appeal in which its classification was questioned. All these twelve appeals were heard by the Appellate Tax Board upon statements of agreed facts, and the board decided that these corporations had been properly classified as manufacturing corporations.

The board adopted and accepted as true all the facts contained in each statement of agreed facts and these findings of fact are final, leaving open the question, as raised by the appellant before the board, whether on those findings the decision of the board was vitiated by error of law. *Assessors of Boston* v. *Boston, Revere Beach & Lynn Railroad,* 319 Mass. 378. *Brockton Knights of Columbus Building Association, Inc.* v. *Assessors of Brockton,* 321 Mass. 110.

The only question presented for decision in these appeals is whether the Appellate Tax Board was right in deciding that those corporations which were organized under the laws of this Commonwealth were domestic manufacturing corporations as defined in G. L. (Ter. Ed.) c. 63, § 38C, as appearing in St. 1937, c. 383, § 1, and whether the remainder of these corporations, which were organized under the laws of other States, were foreign manufacturing corporations as defined in G. L. (Ter. Ed.) c. 63, § 42B, as appearing in St. 1937, c. 383, § 2.

The importance of classifying a corporation as a business or as a manufacturing corporation lies in the fact that the machinery used by a business corporation in the conduct of its business is subject to local taxation at the tax rate fixed by the assessors of the city or town in which the machinery is located, while the machinery of a manufacturing corporation is exempt from local taxation and there is substituted for such local taxation a tax at the rate of $5 per thousand in the assessment of the corporate franchise tax. G. L. (Ter. Ed.) c. 59, § 5, Sixteenth (see St. 1941, c. 467); c. 63, §§ 32, 38C, 39, 42B, as amended.

The nature of the entire businesses actually conducted by these corporations respectively must be examined in order to determine whether their commercial activities conducted in this Commonwealth are such that they may be properly considered as engaged in manufacturing and to such a degree that they may fairly be considered as manufacturing corporations.

The first group of these corporations consists of four corporations, Dwinell-Wright Company, Stanley W. Ferguson, Inc., LaTouraine Coffee Co., and Standard Brands Incorporated, whose business consists in the importation and purchase of green coffee beans, preparing the coffee for the market by roasting, grinding and packaging it, and selling the product. All of them have plants in Boston where these coffee operations are conducted. Dwinell-Wright Company employs one hundred twelve persons, all of whom except three are engaged in preparing the raw coffee for the market. Ninety-seven per cent of its total sales in 1946 or

$4,252,585 was derived from the sales of coffee. Stanley W. Ferguson, Inc., employs over one hundred persons, one half of whom are engaged in the various activities necessitated in converting the raw coffee into a marketable product. Its sales of coffee in 1946 amounted to over $3,500,000 and constituted ninety-five per cent of its total sales. LaTouraine Coffee Co. employs one hundred thirty-four persons, one half of whom are regularly engaged in preparing marketable coffee from the raw beans. Ninety-seven per cent of its gross sales in 1946 amounting to over $3,000,000 was derived from the sales of coffee; the remaining three per cent came from the sales of tea and cocoa. Standard Brands Incorporated employs five hundred persons in its Boston plant, which is devoted exclusively to the blending, roasting, grinding and packaging of coffee, and to the blending, cutting and sifting of tea, and the packaging of it into cartons, tea balls and tea bags. These tea balls and bags are made by machinery at the plant. Tags are printed which are attached by machinery to these receptacles after they are filled by machinery. The cost of making the tea bags at its Boston plant in 1946 amounted to $1,344,539. The output of this plant in 1946 amounted to a little less than $8,000,000 and was about equally divided between sales of tea and sales of coffee.

The raw coffee beans are imported by these corporations from a number of semitropical countries. The coffee from each country has its own particular flavor due to conditions of growth, soil and climate, and to secure the flavor required by the American public it is necessary to blend different kinds of coffee. This blending is done in accordance with a secret formula of the roaster. After the coffee is blended it is put through graders or cleaners to remove all foreign substances, and is then deposited in the roasting machines where it is subjected to a heat of between three and four hundred degrees Fahrenheit for about twenty minutes. The determination of the amount of heat to be applied requires considerable skill and experience so that the coffee will not be baked and all the oils and aroma destroyed. If too little heat is applied the beans will be too bright in color and will

contain various organic elements which should have been driven off or reduced in quantity. The coffee is immediately cooled after roasting and put into machines which grind it for various sizes, open the carton, glue the bottom, put in a liner, weigh the proper amount of coffee, deposit it in the carton and seal the carton. Similar operations as to packaging are done by machinery when the coffee is put in tin or glass containers. We need not discuss the changes wrought in the structure of the raw coffee beans by these operations, all of which are conducted by machines of remarkable efficiency, nor discuss the chemical and physical changes which have resulted from these operations. Green coffee beans are hard, odorless, tasteless and useless. The green coffee by these operations has been transformed into an article with entirely different appearance, color, frangibility and taste. As a practical matter, it may be said that the raw coffee has entirely lost its former identity and has been converted into an article of utility and value.

The second group of corporations consists of three corporations; all of them have plants in Boston; two of them are engaged in the preparation of soft drinks, and the third is engaged in the production of fruit syrups, the extraction of juice from oranges and lemons, and the shredding of orange and lemon peels. Coca-Cola Bottling Company of Boston is engaged solely in the business of making and selling a certain carbonated beverage. Water from the city mains is purified and combined with carbon dioxide gas which is derived from dry ice purchased by the company. This carbonated water is fed into bottles which have been cleaned and sterilized and in which an appropriate amount of syrup purchased by the company has been placed. The bottles are then capped and ready for shipment. All of these various operations are performed by machinery. All of the company's employees are engaged in the production and sale of this beverage, and it is the only source of the company's income. American Dry Ginger Ale Company, Incorporated, makes soft drinks of various flavors. It compounds its own syrups and combines them with water that has been charged with carbonic acid gas. Orange

Food Products, Inc., selects the different kinds of oranges and lemons in order to secure the desired flavor for the orange or lemon juice, extracts the juice by machinery, and bottles and sells it. The peels of the oranges and lemons are shredded, covered by flake ice produced by the company, and sold for making marmalade and jams. Fruit syrups are made of fruit juices, sugar, acid, fruit oil emulsions and other ingredients, and are sold for beverage bases for certain kinds of mixed drinks. During 1946 the sales of fruit juices amounted to $278,802.83, of syrups to $16,351.57, and of shredded peel to $352.92. During the first nine months of 1947 it received $207,895.33 from the sales of juices and $18,815.73 from the sales of syrups. The production of syrups during these periods was greatly restricted by governmental controls on the use of sugar.

Whiting Milk Company maintains a plant in Boston, employing over one thousand persons, and is engaged in the pasteurization and homogenization of milk, the preparation of chocolate milk, the separation and pasteurization of cream, the making of butter, buttermilk, soft cheeses and ice cream mix, and the sale of all of these products except butter which is used in making some of its products. The ice cream mix is composed of cream, condensed milk or milk powder, sugar or corn syrup, egg yolk, some stabilizing material, and flavoring. Its gross sales for 1946 of products treated, prepared and made in this Commonwealth and sold here amounted to nearly $15,000,000 and those sold in Rhode Island amounted to over $500,000. The principal revenue was received from sales of pasteurized and homogenized milk and cream. The sales of ice cream mix amounted to more than $600,000, and of soft cheeses to more than $400,000. The average annual sales of chocolate milk when there were no shortages of sugar and chocolate amounted to $90,000.

Merchants Wool Scouring Company, a Massachusetts corporation, is engaged in the business of processing raw and waste wool for the account of others at its plant in Boston. If the wool when received is not in condition for scouring because it contains a slightly excessive amount

of foreign matter, it is fed into a dusting machine; or if it is matted it is put into a breaker machine; or if heavily matted it is put into a machine known as the tag breaker. Wool containing burrs is treated by a burr picking machine, and if the wool is not then relatively free from burrs it is carbonized by submerging it into a solution of sulphuric acid. When the wool is ready for scouring, it is put upon a conveyor belt, studded with pins, which catches the wool and raises it upward while it is combed out and evened off by a toothed rake, and it is finally deposited in a vat in which it is submerged in hot water to which a chemical solution is added and where it is agitated by a series of rakes. The wool is removed from this vat and the water squeezed out, and it is again submerged in a second vat in a solution of water and another chemical compound. It is then removed and treated in a similar manner in a third vat. It is finally conveyed to a fourth vat known as the rinsing or bleaching vat where it is again submerged in water to which a bleaching solution is added if the customer desires the wool to have a certain color. The wool is removed from this vat, dried, bagged and shipped to the customer, and it is ready for carding and spinning into thread, cloth or rugs. The different processes to which the wool has been subjected are essential steps in the changing of raw wool before it can be made up into cloth.

Pittsburgh Plate Glass Company, a foreign corporation, is engaged in the business of manufacturing and selling plate glass and articles consisting principally or partly of glass. It has plants and sales offices in Boston, Worcester and Springfield. It makes no glass in this Commonwealth but ships large quantities of glass from its main plant in Pennsylvania. Glass in large sheets is shipped to its Massachusetts plants where it is cut to size and edged by grinding for store fronts and windows, partitions, and kitchen and bathroom walls. Glass for show cases is cut, shaped and polished, set in metal or wooden frames, and supplied with mirrors if the customer requires. Glass is also fashioned for automobile windows, and for tops for tables and desks. All of the mirrors sold in this Commonwealth are manu-

factured here out of the glass shipped from Pennsylvania. The sales of mirrors at Boston in 1946 amounted to $143,825. During that period the gross receipts of the Boston plant amounted to $1,565,379. The company in that year in the conduct of its Boston plant received $148,689 for labor expended in the installation of store fronts, show windows, kitchen and bathroom walls, automobile windows, and table and desk tops. It sold in 1946, $444,179 worth of paint, none of which was manufactured in this Commonwealth. The gross sums received in 1946 at its Springfield and Worcester plants were derived in relatively the same manner and proportions as those at its Boston plant.

Carter, Rice and Company Corporation, a domestic corporation, organized for the purpose of manufacturing, buying and selling all kinds of paper, cardboard, envelopes and articles in the manufacture of which paper or cardboard is used, occupies more than sixty-seven thousand square feet of floor space in a Boston building as its administrative headquarters and plant, of which an entire floor comprising nine thousand square feet is fully equipped with machinery and is devoted almost exclusively to the operations next described. Paper is slit and cut to the desired sizes for business cards and also into small rectangular pieces to be used in wrapping bar candy. Sometimes, when the paper is cut to the appropriate size, the corners are rounded or segments are cut in the sides in order that, when used as separators in candy boxes, they may be readily grasped or removed. Cards for wedding invitations or calling cards are paneled so as to present a sunken panel to receive the printed matter for which the finished product is ultimately intended. Many designs, as for greeting cards, require the cutting of one or more windows in the paper, and this work, like the other operations herein mentioned, is done by machinery, and in connection with the particular process last stated the company has a machine to make the embossing plates and the steel rule dies used in producing cards like greeting cards. Paper or cards for book fillers, filing systems and indices are produced. Some of the paper is embossed with the name,

trade mark or other symbol of the customer. Large sheets of paper used in the manufacture of candy are embossed and reinforced by gluing tabs to the paper. Pads of various sizes are made with a cheesecloth binding affixed with glue. Besides these operations the company is engaged in the purchase and sale of paper and paper products. The gross receipts of the corporation in 1946 from all its Massachusetts activities amounted to a little more than $4,500,000, of which nearly $400,000 was derived from the sale of materials which had been subjected to one or more of the operations which have been mentioned. Thirty of its two hundred five persons were engaged exclusively in these operations which netted the corporation about one eighth of its profits.

Boston Mailing Company maintains a plant in Boston where various operations in the making of folders, pamphlets, briefs, books and magazines are conducted. Large sheets containing advertising matter are cut and folded into different sizes best adapted to the quality of the paper to be folded and the number of folds to be made. An addressing and mailing service is carried on for customers who furnish the material to be mailed and a mailing list. The envelopes are addressed by the use of addressographs for which the company cuts the plates. Pamphlets, records and briefs of counsel in pending litigation and paper covered books and magazines which are to be bound by the company arrive in the form of large sheets already printed, which are cut into the proper sizes so that, when folded, they will make a pamphlet or book of eight, sixteen, thirty-two or sixty-four pages. The sheets are usually cut so as to make a sixteen-page section when folded. These sections, if not too thick, are put in the appropriate page order with a cover into a stapling machine and bound together. Sections of a program are usually stitched together by an electric silk stitcher. If the sections are too thick, they are bound together by stapling the left hand side of the pages, and the left hand edges are smeared with glue and the cover attached. Records and briefs instead of being stapled are sewn by an electric sewing machine. Eighty-three per cent of its income is derived from its binding business.

The language of the statutes, G. L. (Ter. Ed.) c. 63, §§ 38C, 42B, as appearing in St. 1937, c. 383, §§ 1, 2, affords little aid in the classification of corporations for, in so far as pertinent, the statutes merely state that a corporation which is engaged in manufacturing shall be deemed to be a manufacturing corporation. Nothing is said as to what constitutes manufacturing nor, if it is engaged in both manufacturing and nonmanufacturing activities, how much manufacturing must be done in order that the corporation may be classified as a manufacturing corporation. We must turn to sources other than the language of these statutes to find the answers to these questions.

What is or is not manufacturing has been frequently decided in our own decisions. In *Commonwealth* v. *Green*, 253 Mass. 458, 459, it was said, in holding that the brewing of beer by a householder for his own use was the manufacture of beer, that "The verb 'manufacture' is synonymous with make. To manufacture is to make wares or other products by hand, machinery or other agency. It may also be defined to work, as raw or partly wrought materials into suitable forms for use"; and in *Boston & Maine Railroad* v. *Billerica*, 262 Mass. 439, 444, 445, it was said that "Involved in the conception of manufacture is the implication of change wrought through the application of forces directed by the human mind, which results in the transformation of some preëxisting substance or element into something different, with a new name, nature or use." In dealing with this same question of the classification of business and manufacturing corporations, a definition of manufacturing similar to the two just quoted was recently adopted and applied in *Commissioner of Corporations & Taxation* v. *Assessors of Boston*, 321 Mass. 90, 94. The term manufacturing has no technical meaning, *Friday* v. *Hall & Kaul Co.* 216 U. S. 449, 454, and definitions are not of much assistance in cases lying close to the line between nonmanufacturing and manufacturing activities. *Assessors of Springfield* v. *Commissioner of Corporations & Taxation*, 321 Mass. 186, 191. Many cases like the supplying of water, *Dudley* v. *Jamaica Pond Aqueduct Corp.* 100 Mass. 183,

*Coffin* v. *Artesian Water Co.* 193 Mass. 274; the mining of coal, *Byers* v. *Franklin Coal Co. of Lykens Valley,* 106 Mass. 131; the cutting and storing of ice, *Hittinger* v. *Westford,* 135 Mass. 258; the quarrying of stone, *Wellington* v. *Belmont,* 164 Mass. 142; the publishing of a newspaper, *Barron* v. *Boston,* 187 Mass. 168; and the production and transmission of artificial sound waves by a telephone company, *Assessors of Springfield* v. *Commissioner of Corporations & Taxation,* 321 Mass. 186, do not constitute manufacturing. See *Ingram* v. *Cowles,* 150 Mass. 155. The production of bread and pastry, the preparation and canning of jams and jellies, the making of sausages, the curing and smoking of bacon and ham, and the making of lard were held to be manufacturing in determining that corporations engaged in those activities were properly classified as manufacturing corporations within G. L. (Ter. Ed.) c. 63, §§ 38C, 42B. *Commissioner of Corporations & Taxation* v. *Assessors of Boston,* 321 Mass. 90, 94, 95.

The statutes granting exemption from the local tax on the machinery of corporations engaged in manufacturing must be fairly construed and reasonably applied in order to effectuate the legislative intent and purpose to promote the general welfare of the Commonwealth by inducing new industries to locate here and to foster the expansion and development of our own industries, so that the production of goods shall be stimulated, steady employment afforded to our citizens, and a large measure of prosperity obtained. *Commissioner of Corporations & Taxation* v. *Assessors of Boston,* 321 Mass. 90, 95, 96.

The coffee business, in which the first group of corporations is engaged, consisted in the conversion of a raw material which was unfit for human consumption or any other practical use into a finished product which differed substantially from the raw material in appearance, form and taste, and which was thereby made adaptable to a use for which it otherwise would not be available. To be sure, it retained the name of coffee, but that term in the public mind ordinarily refers not to green but to roasted and ground coffee ready for immediate use as a beverage. No

one would contend that a customer ordering a pound of coffee at a retail store intends to purchase raw green coffee beans. Manifestly, the article intended is that which has been subjected to processes similar to those employed by these corporations. We think the transformation wrought by these processes has, as a practical matter, resulted in a new article and a new use, even though the name of the raw material still is retained. That name is not decisive, for canned corn and peas still retain their natural names, yet the canning of them constitutes manufacturing. *Phillips v. Byers,* 189 Cal. 665. *Nixa Canning Co.* v. *Lehmann-Higginson Grocer Co.* 70 Kans. 664. *County Commissioners of Carroll County* v. *B. F. Shriver Co.* 146 Md. 412. Somewhat analogous are the refining of sugar and the milling of flour, both of which have been said to be manufacturing. *State* v. *American Sugar Refining Co.* 108 La. 603. *Hall & Son* v. *Guthrie's Sons,* 31 Ky. Law Rep. 801. *Carlin* v. *Western Assurance Co.* 57 Md. 515. The decisions as to whether the business of these coffee corporations is manufacturing are in conflict, but we prefer to follow those which hold that it is. *Louisville* v. *Zinmeister & Sons,* 188 Ky. 570. *Cain's Coffee Co.* v. *Muskogee,* 171 Okla. 635. See *In re I. Rheinstrom & Sons Co.* 207 Fed. 119, 143, affirmed sub nomine *Central Trust Co.* v. *George Lueders Co.* 221 Fed. 829, 840, certiorari denied 238 U. S. 634, appeal dismissed 239 U. S. 11. Compare *New Orleans* v. *New Orleans Coffee Co. Ltd.* 46 La. Ann. 86; *People* v. *Roberts,* 145 N. Y. 375; *Commonwealth* v. *Glendora Products Co.* 297 Pa. 305.

Of the two soft drink concerns included in the second group of corporations, one purchases its syrup, the other makes its syrups; one carbonates the water, the gas being derived from dry ice, the other charges the water with carbonic acid gas; but both combine different ingredients into a new product. They make a soft drink. It was said in *Murphy* v. *Arnson,* 96 U. S. 131, 134, that "Beer may well be said to be manufactured from malt and other ingredients, whiskey from corn, or cider from apples." That the making of these beverages is within the concept of manufacturing is settled by *Commonwealth* v. *Green,* 253

Mass. 458. See also *Carlsbad Water Co.* v. *New*, 33 Colo. 389; *Ballard* v. *Hammond Coca-Cola Bottling Co. Ltd.* 147 La. 580. Compare *Citizens' & Marine Bank* v. *Mason*, 2 Fed. (2d) 352.

The third corporation in this group sells fruit juices, makes and sells fruit syrups, and shreds and sells orange and lemon peels. The making of fruit syrups constitutes manufacturing the same as the making of jams and jellies, *Commissioner of Corporations & Taxation* v. *Assessors of Boston*, 321 Mass. 90, 94, the canning of foods, *County Commissioners of Carroll County* v. *B. F. Shriver Co.* 146 Md. 412, and the making of potato chips, *Commonwealth* v. *Snyder's Bakery*, 348 Pa. 308.

The assessors contend that the extraction of juice and the shredding of peel are not manufacturing operations, and that the remaining business, which was the making of syrups, was too insignificant to warrant the classification of this corporation as a manufacturing corporation. They point out that, even if the sales of syrup were greatly restricted by governmental control over sugar, they amounted to only ten per cent of the total sales of all its products by the corporation in 1945, five and one half per cent in 1946, and eight and three tenths per cent for the first nine months of 1947. Even if we assume in favor of the assessors, but without making any intimation, that the operations mentioned were not manufacturing processes, it does not follow that the classification was wrong for reasons which will presently appear in dealing with a similar contention raised in the Whiting Milk Company case. We think that the classification made by the commissioner was right.

Whiting Milk Company pasteurizes and homogenizes large quantities of milk. The first of these processes by the use of various mechanical devices removes foreign matter from the milk, kills bacteria, and preserves the freshness of the milk, and the second subjects the milk to pressure sufficient to break up the butter fat globules and distribute the butter fat uniformly throughout the milk. It is unnecessary to decide whether either of these operations consti-

tutes manufacturing in deciding whether the classification of the intervener was right for reasons hereinafter stated. See *Suabedissen-Wittner Dairy, Inc.* v. *Department of Treasury,* 105 Ind. App. 626; *Louisville* v. *Ewing Von-Allmen Dairy Co.* 268 Ky. 652; *Meen* v. *Pioneer Pasteurizing Co.* 90 Minn. 501; *People* v. *Sohmer,* 218 N. Y. 199. Compare *North College Hill* v. *Woebkenberg,* 59 Ohio App. 458. The company, however, makes chocolate milk and ice cream mix. The making of the chocolate milk is a manufacture of this beverage the same as the making of the soft drinks already discussed. There would seem to be little doubt but that the ice cream mix is also the product of manufacture. *Hughes & Co.* v. *Lexington,* 211 Ky. 596. *Ballard* v. *Kentwood Ice Manuf. & Bottling Works, Ltd.* 147 La. 583. *Syracuse Ice Cream Co.* v. *Cortland,* 153 App. Div. (N. Y.) 456. We think that the making of soft cheeses could be found to constitute manufacturing. The process employed by the company in making this product is disclosed by the record. Different methods of its manufacture are set forth in *Columbia Cheese Co.* v. *McNutt,* 137 Fed. (2d) 576. Cheese is sometimes defined by statute. *People* v. *Martin,* 88 Misc. (N. Y.) 519. Statutes and regulations governing the manufacture of cheese are based upon the assumption that it is a manufactured article. *Columbia Cheese Co.* v. *McNutt,* 137 Fed. (2d) 576. *State* v. *Langlade County Creamery Co.* 193 Wis. 113. *Matter of Kenyon & Fenton,* 1 Utah, 47, 49. It was said in *Commonwealth* v. *Elm Farm Milk Co.* 221 Mass. 68; 69, "that where milk is separated into cream and skim milk and each part is separately treated under a patented process wherein certain chemical changes are involved whereby the milk loses its identity as such and a new and unique product known as 'concentrated milk' results, the statute forbidding the addition of water to milk is not violated by the addition of water to this compound because it is not milk, but a different substance. When milk is so completely changed in its essential parts, and a new article of commerce is produced which is so substantially different that it is no longer milk, but is something else, differing from milk in name and nature, like

butter, cheese, condensed or concentrated milk, then the statute has no application."

The company realized in 1946 from its sales of soft cheeses more than $400,000, and from its sales of ice cream mix more than $600,000. It was agreed that in normal times, in the absence of governmental sugar restrictions, $90,000 would be the income from the sales of chocolate milk. We are therefore dealing with three branches of the company's business in which the annual sales amount to more than $1,000,000. If its entire business consisted only of conducting these three branches, there could be little doubt but that it would be a manufacturing corporation, but it is contended that, as these sales comprised only a comparatively small percentage of the total sales, the operation of these three branches did not entitle the corporation to be classified as a manufacturing corporation. It is contended by the assessors that the gross income from its manufacturing activities should amount to at least a certain percentage of its total income before a company should be classified as a manufacturing corporation. They suggest twenty per cent. *10 East 40th Street Building, Inc.* v. *Callus*, 325 U. S. 578. *Baldwin* v. *Emigrant Industrial Savings Bank*, 150 Fed. (2d) 524, 525, certiorari denied sub nomine *Emigrant Industrial Savings Bank* v. *Baldwin*, 326 U. S. 767. That might have been a convenient standard for the Legislature to have adopted, but the difficulty is that it has provided no such criterion. The statutes do not require a corporation to be wholly engaged in manufacturing, or indeed that its principal business should be manufacturing, before it should be deemed to be a manufacturing corporation. On the other hand, it is to be noted that the extent of the exemption granted to manufacturing corporations is not only the machinery actually used in manufacturing but all the machinery of the corporation. The exemption is extensive when applicable. The purpose of the exemption, however, was not to aid nonmanufacturing corporations, and the performance of any manufacturing by what is essentially a nonmanufacturing corporation does not confer upon it the right to enjoy the exemption. *Commissioner*

*of Corporations & Taxation* v. *Assessors of Boston*, 321 Mass. 90, 96. *Martin & Shayot* v. *Thibaut*, 37 La. Ann. 21. *People* v. *Roberts*, 155 N. Y. 408. *Commonwealth* v. *Keystone Laundry Co.* 203 Pa. 289. We must not lose sight of the fact that the consideration which moved the Commonwealth to grant the exemption was the furnishing of more opportunities for the employment of her citizens. When a corporation conducts various lines of business, some of which are manufacturing and some of which are not, it is difficult, if not impossible, to formulate in advance any rigid or fixed rule for determining whether, in view of the public policy declared by the Legislature, such a corporation should be classified as a manufacturing corporation. The fact that the manufacturing end of the business is not nearly so profitable as the nonmanufacturing end is not decisive. It may be that a large number of the employees of a merchandizing corporation and a large amount of its capital are employed in its manufacturing activities in order to secure an uninterrupted supply of goods of a superior quality, to enhance its reputation, and to increase its business in all its various merchandizing departments. Instances may easily be imagined where a corporation is required in the usual course of its business to conduct both manufacturing and nonmanufacturing branches of business if the corporate business is to succeed. Wholesale fish companies employing a comparatively few employees may join in conducting a canning business of their surplus fish or in making glue from the fish waste. The milk business with a wide spread at different times of the year between the production and the demand for fluid milk might require the milk to be used in making various products. The Legislature did not intend to impede these corporations from entering into the domain of manufacturing, and, when the manufacturing part of its business has been developed and maintained as an important and material branch of the business of the corporation when considered with the entire business conducted by the corporation, then such a corporation is entitled for the purposes of the pertinent statutes to be classified as a manufacturing corporation. Many of

the factors involved in making such a classification were mentioned in *Commissioner of Corporations & Taxation* v. *Assessors of Boston,* 321 Mass. 90, 97. Upon the findings of fact made by the board it cannot be said that the classification of this intervener was unwarranted.

Merchants Wool Scouring Company does nothing but the scouring of wool for the account of others. It was said, although by way of dictum, in *Hartranft* v. *Wiegmann,* 121 U. S. 609, 615, that "Washing and scouring wool does not make the resulting wool a manufacture of wool." It was decided in *Commonwealth* v. *Densten Felt & Hair Co.* 304 Pa. 536, that the cleaning of cattle hair preparatory to its use in trade and commerce was not a manufacturing operation. The same conclusion was reached in *Georgia Warehouse Co.* v. *Jolley,* 172 Ga. 172, with reference to the ginning of cotton. The assessors contend that the scouring of wool does not comprise manufacturing any more than does the conducting of a laundry — a business generally considered not to be manufacturing. *Commissioner of Corporations & Taxation* v. *Assessors of Boston,* 321 Mass. 90, 95, and cases cited.

The intervener does not contend that it is a manufacturer of wool, and the statutes here involved are entirely different in their language and purpose from the tariff regulations in question in *Hartranft* v. *Wiegmann,* 121 U. S. 609. The *Densten* case is in line with the Pennsylvania decisions which indicate a tendency to construe somewhat strictly the statutes granting tax exemptions on machinery used in manufacturing. See *Commonwealth* v. *Glendora Products Co.* 297 Pa. 305, [1] and cases cited, for further illustrations of this tendency. There is little resemblance between scouring wool and laundering soiled wearing apparel unless both are to be considered isolated from all attending circumstances. A man wants his linen laundered so that he may again wear it, but a man wants a lot of wool scoured in order that he may turn it into cloth, rugs or some other finished product. If the scouring were done by a textile

---

[1] We have already cited this decision and have declined to adopt its conclusion that coffee roasters were not engaged in manufacturing.

manufacturer in his own factory, it would be difficult to say that those employed in the scouring department were not engaged in manufacturing. If the manufacturer let the work in that department out to an independent contractor to be performed in the manufacturer's factory, the insurer of the manufacturer could not avoid the payment of workmen's compensation to an employee of the independent contractor injured while performing a part of or a process in the trade or business of the manufacturer. In other words, the scouring of the wool is an essential and integral part of the manufacturing of textiles. The wool cannot be used for manufacturing until it has been scoured. The scouring does more than merely remove foreign matter from the wool. It removes a portion of the natural elements contained in the fibers. To say that manufacturing does not start until after the wool has been scoured does not seem to be a realistic view of the situation. It would be more accurate to say that scouring is the first step in transforming the wool into a new finished product. We think manufacturing begins with the scouring.

In *Burke* v. *Stitzel-Weller Distillery*, 284 Ky. 676, it was held that bottling machinery was exempt from taxation notwithstanding a contention that the whiskey bottled had been completely manufactured before it reached this machinery. The bottling of whiskey in and of itself might not be regarded as a manufacturing process, but it is when it appears that it is a practical and necessary step in the production of the finished article.

It is a matter of indifference to our public policy, declared by the statutes exempting the machinery of manufacturing corporations, whether all the manufacturing is done by one corporation or a part of it is performed by an independent contractor if the latter is also a manufacturing corporation, provided of course the work is performed in this Commonwealth. These statutes favor manufacturing corporations and are not directed against such corporations acting as independent contractors. These statutes must be fairly construed to effectuate if reasonably possible the legislative intent and purpose. The words "engaged in manufac-

turing" are not to be given a narrow or restricted meaning. *Hughes & Co.* v. *Lexington,* 211 Ky. 596. *County Commissioners of Carroll County* v. *B. F. Shriver Co.* 146 Md. 412. We think that the scouring of wool is so closely related to its conversion into cloth, rugs or some other finished product that it should be construed as manufacturing within the letter and spirit of these exemption statutes.

Pittsburgh Plate Glass Company in making mirrors to the amount of $143,825 at its Boston plant alone was engaged in manufacturing. Cutting, shaping and polishing glass according to specifications, grinding the edges of the glass, and then setting the glass in wooden or metal frames and assembling the glass into show cases constitute at least a partial if not the complete manufacture of show cases. The work performed with reference to show cases was one item under the heading of "fabrication" amounting to $148,689, which denotes the labor expended and the amount apparently collected for cutting and setting up specially prepared glass for store fronts, windows, partitions, show cases, and other work. The sales of the mirrors and at least the work done in manufacturing show cases, even if we disregard the other labor items comprising "fabrication," were substantial in amounts and furnished employment to our citizens. Under the principles already discussed, it is plain that it would contravene the public policy of this Commonwealth declared in the tax exemption statutes to say that the company was not properly classified as a manufacturing corporation.

Carter, Rice and Company Corporation in producing the layer cards for wrapping bar candy and as separators in packaged candy, the embossed paper with the name or trade mark or symbol of the customer for the confectionery trade and also sheets of such embossed paper reinforced by tabs and used in the making of confectionery, the paneled cards for wedding invitations and calling cards, and the greeting cards with and without windows cut into them, was engaged in manufacturing operations. All these operations were performed by machinery. They all constituted necessary and

essential steps in the manufacture of paper products which, when the subsequent processes were completed, resulted in a new product, having a new name and a new use. The manufacture of most articles consists in a series of separate and independent operations, each complete in itself, the effect of which is partly to work the material so as to put it in a condition for the application of the next process, and so on until the article is finally finished and fabricated into a new article. *Tide Water Oil Co.* v. *United States*, 171 U. S. 210, 216. See *Ingram* v. *Cowles*, 150 Mass. 155. There comes a time when the process puts the raw material into a partly wrought condition as a preliminary step to final fabrication. It was said in the *Tide Water Oil Co.* case, at page 217, that while the sawing of the logs into boards may not be considered as a manufacturing operation, yet the cutting and planing of the boards into the required dimensions to be assembled into boxes "was doubtless a partial manufacture." It was said in *United States* v. *Dudley*, 174 U. S. 670, 673, in distinguishing between dressed and manufactured lumber, "but if its manufacture has so far advanced that it can only be used for a definite purpose, as sashes, blinds, mouldings, spars, boxes, furniture, etc., it becomes a 'manufacture of wood.'" In the instant case, the operations just mentioned put the product as it left the company's hands into such condition that this material could not be finally used for any purpose other than in the completion of the particular finished article for the manufacture of which these operations of the company were conducted. Indeed, the finished product could not come into existence unless the material had been so treated by the company. We think that these operations constituted the partial manufacture of these various completed articles. Of course, the finished material was composed of paper, but so is a book or magazine, and the making of a book or magazine is manufacturing. That the form and nature of the partly wrought material still continue to be paper is not decisive if the finished product has been transformed into a new article, with a new name and designed for a particular use. No one would contend that one who molds clay into

different sizes and burns it is not a manufacturer of bricks simply because nothing but clay is used. *Wellington* v. *Belmont,* 164 Mass. 142, 143. We also think that the making of the pads with the cheesecloth binding constituted manufacturing. See *United States* v. *George Meier & Co.* 136 Fed. 764; *United States* v. *Hensel, Bruckmann & Lorbacher,* 152 Fed. 578; *Commonwealth* v. *Peerless Paper Specialty, Inc.* 344 Pa. 283.

The relationship of these operations to the corporation, in view of the value of the machinery employed, the space occupied, the number of employees engaged in them, the value of the output of the department in which these operations were conducted, the amount of the sales of the goods produced in this department, and its proportion to the gross sales of the company and to its net profits, prevents us under the principles already discussed from saying that these operations were merely trivial or incidental to the entire operations of the company and that the company was not rightly classified as a manufacturing corporation.

Boston Mailing Company, which cuts the printed sheets, arranges them according to the number of the pages, puts them in sections, and attaches these sections by stapling machines or sews them together by a stitching machine, and then puts them together under a permanent cover to form pamphlets, books and magazines, is clearly engaged in manufacturing. *Seeley* v. *Gwillim,* 40 Conn. 106. *American Newspapers, Inc.* v. *State Tax Commission,* 174 Md. 56.

The decision in each of these cases must be for the commissioner.

*So ordered.*