COMMISSIONER OF CORPORATIONS AND TAXATION & another
*vs.* ASSESSORS OF BOSTON
(and another case [1]).

Suffolk.    February 7, 8, 1949. — March 7, 1949.

Present: QUA, C.J., LUMMUS, RONAN, WILKINS, & SPALDING, JJ.

*Taxation*, Manufacturing corporation; Personal property tax: machinery, exemption. *Corporation*, Manufacturing corporation. *Words*, "Manufacturing."

Upon agreed facts, the Appellate Tax Board should have decided that a certain domestic corporation, twenty per cent of whose business consisted of processing mahogany logs imported by it into mahogany veneer, was "engaged in manufacturing" and that therefore, under G. L. (Ter. Ed.) c. 63, § 38C, as appearing in St. 1937, c. 383, § 1, its machinery was exempt from local taxation.

The mere fact, that the principal business of a corporation is nonmanufacturing, does not prevent its classification as a corporation "engaged in manufacturing" under G. L. (Ter. Ed.) c. 63, §§ 38C, 42B, as appearing respectively in St. 1937, c. 383, §§ 1, 2, if in the actual conduct of its business it also conducts manufacturing to an extent far greater than that which is merely trivial or only incidental to its principal business.  Per RONAN, J.

The Appellate Tax Board should have decided that a certain foreign corporation engaged, with its principal place of business in this Commonwealth, in importing, sifting, cutting and blending tea, making bags and boxes for tea bags, making boxes for all packaged tea, and selling tea throughout the United States, was "engaged in manufacturing" under G. L. (Ter. Ed.) c. 63, § 42B, as appearing in St. 1937, c. 383, § 2, and that therefore its machinery was exempt from local taxation where an agreed statement of facts showed that the making by machinery of tea bags constituted a large and essential part of its business.

APPEALS from decisions by the Appellate Tax Board.

*F. E. Kelly*, Attorney General, & *H. W. Radovsky*, Assistant Attorney General, for the Commissioner of Corporations and Taxation, submitted a brief.

---

[1] The other appeal is by the commissioner of corporations and taxation and the intervener, Salada Tea Company, against the assessors of Boston.

*E. C. Park,* (*P. F. Grogan* with him,) for Palmer & Parker Company.

*R. Ely,* (*R. A. Cormier* with him,) for Salada Tea Company.

*W. H. Kerr,* for assessors of Boston.

RONAN, J.   The commissioner of corporations and taxation classified the intervener in the first proceeding, Palmer & Parker Company, as a domestic manufacturing corporation and the intervener in the second proceeding, Salada Tea Company, as a foreign manufacturing corporation, in a list prepared by him in accordance with G. L. (Ter. Ed.) c. 58, § 2, as most recently amended by St. 1941, c. 726, § 2, and submitted on April 17, 1947, to the board of assessors of Boston as a list of corporations liable on January 1, 1947, to taxation in the city of Boston under G. L. (Ter. Ed.) cc. 59, 60A and 63.   The commissioner having failed to change the classification of these interveners in accordance with applications of the board of assessors, the latter appealed to the Appellate Tax Board, which decided that they should have been classified as business and not as manufacturing corporations.   The appeals of the commissioner and the intervener in each proceeding bring these cases here.

Palmer & Parker Company is engaged in the importation of mahogany logs, the processing of them into veneer and lumber, and the sale of the veneer and lumber.   Its plant is located in Boston where it employs seventy-five persons. Mahogany logs cut from trees selected by the company's logging expeditions in Africa, Central America and South America are shipped to Boston, where they are stored in a salt water bay adjoining the plant to prevent drying out and to protect them from infestation by insects.   When needed, the logs are placed upon a movable saw carriage and the outer surfaces of each log are sawed off so as to form a four-sided log.   The log is then examined for texture, figure and grain, and, if found suitable for veneer, portions or flitches, as they are called in the trade, are cut from the log in the form of flat slabs lengthwise, or are cut for quartered stock diagonally toward the center of the log.   Some flitches

range from six to sixteen feet in length and some vary from six to twenty-five inches in thickness. The flitches are placed in vats containing steam and water for such time as a skilled vat operator determines will be sufficient to prevent cracking of the wood during the slicing operations. The flitches are then put in a slicing machine and sliced into sheets varying from one one-hundredth to one eighth of an inch in thickness, dried, graded and sold. Logs not suitable for veneer and portions of logs remaining after the flitches have been cut out are sawed into boards in such a way as to produce figured, quartered or plain mahogany. The edges and ends of the boards are trimmed and, after being sorted according to grade, length and thickness, the boards are put upon racks to dry and are finally kiln dried. About one third of these boards are planed. The production of boards constitutes about eighty per cent of the company's business and the production of veneer the remaining twenty per cent of its business.

Salada Tea Company, a foreign corporation, has its principal place of business in Boston. It is engaged in importing, sifting, cutting and blending tea, making bags and boxes for tea bags, making boxes for all packaged tea, and selling tea throughout the United States. It employs three hundred fifty-two persons in this Commonwealth. The capital invested here amounts to $3,168,668.06.

Dried tea leaves are imported in bulk from the Orient. The tea is removed from different chests to secure the proper blend, placed in a conveyor system, inspected, put through the cutting machines from which it is discharged into a large rotating tank where it is mixed to produce the company's brand of tea, and then conveyed into large glass containers from which it flows to the tea bag making machines and to the box filling machines.

Tea bags of the pillow type are produced in large quantities by the thirty-five machines operated by the company. Two rolls of special filter paper are fed into each machine; the paper is folded longitudinally, and drawn over a funnel-shaped device which forms the bag; tea flows into the bags

in amounts measured by a weighing device so that each bag contains precisely the right amount of tea, the flow of tea being synchronized with the flow of paper; the open edges of the bags are sealed; and the rows of tea bags, which are still attached to each other, are separated by cutting knives into single bags and deposited in a chute from which they are taken and packed by hand into cartons. These machines attach tags bearing the company's brand name to the bags intended for the restaurant trade. Each box into which the tea bags are packed is made from a piece of cardboard, which is cut to shape, scored and printed by the concern from which it is purchased. The piece of cardboard is automatically fed by suction into a machine which forms the folded piece of cardboard into a box, glues and seals the bottom of the box, and inserts and glues a paper lining to the inside of the box. The cartons are then filled by hand with tea bags, and the tops of the boxes are then glued and sealed by machinery.

Boxes for packaged tea are formed by machinery out of pieces of cardboard, each piece being really a folded or flat box, and these boxes are filled by machinery in substantially the same manner as are the tea bags.

Nearly $1,500,000 of the company's capital is invested in making and filling tea bags and the boxes into which these tea bags are packed, and nearly $500,000 is invested in the making of boxes for packaged tea and the packaging of tea in them. The cost of making the tea bags and boxes for these bags represents forty-one per cent of the operating costs of the company. The making of boxes for packaged tea represents thirteen per cent of such cost. A little less than eighteen per cent of all the tea sold by the company is sold in this Commonwealth.

Each case was submitted to the Appellate Tax Board upon a statement of agreed facts. The question presented in the first case is whether the board was in error in deciding that the intervener should have been classified by the commissioner as a domestic business corporation as defined in G. L. (Ter. Ed.) c. 63, § 30, cl. 1, and not as a domestic manu-

facturing corporation as defined in G. L. (Ter. Ed.) c. 63, § 38C, as appearing in St. 1937, c. 383, § 1; and in the second case whether there was error in deciding that the intervener should have been classified by the commissioner as a foreign corporation as defined in G. L. (Ter. Ed.) c. 63, § 30, cl. 2, as amended by St. 1943, c. 459, § 1, and not as a foreign manufacturing corporation as defined in G. L. (Ter. Ed.) c. 63, § 42B, as appearing in St. 1937, c. 383, § 2.

The legislative history of the pertinent statutes granting manufacturing corporations an exemption from local taxation upon their machinery, G. L. (Ter. Ed.) c. 59, § 5, Sixteenth, as appearing in St. 1941, c. 467, and imposing an excise tax on such machinery at the rate of $5 per thousand valuation, G. L. (Ter. Ed.) c. 63, §§ 30, cl. 1, 38C, 39 (1), 42B, as amended, the legislative purpose and intent in passing these statutes, the interpretation of these enactments, and their application to various corporations engaged in many different kinds of commercial activities, have been recently discussed by this court and we need not repeat what was there said. *Commissioner of Corporations & Taxation* v. *Assessors of Boston,* 321 Mass. 90. *Assessors of Springfield* v. *Commissioner of Corporations & Taxation,* 321 Mass. 186. *Assessors of Boston* v. *Commissioner of Corporations & Taxation,* 323 Mass. 730.

The words "engaged in manufacturing" as used in G. L. (Ter. Ed.) c. 63, §§ 38C, 42B, as respectively appearing in St. 1937, c. 383, §§ 1, 2, in defining domestic and foreign manufacturing corporations respectively, are words of flexible meaning. *Assessors of Boston* v. *Commissioner of Corporations & Taxation,* 323 Mass. 730. Their significance depends upon the phraseology of the statutes in which they are employed and especially the aim and object intended to be accomplished by the Legislature. The term "manufacturing" assumes different meanings in different statutes designed to accomplish entirely different purposes. Where the intent is clear, the statute, if reasonably possible, must be construed to carry out that intent. *Frye* v. *School Committee of Leicester,* 300 Mass. 537, 538. *Lehan* v. *North*

*Main Street Garage, Inc.* 312 Mass. 547, 549. *Price* v. *Railway Express Agency, Inc.* 322 Mass. 476. The varying meanings to be attributed to the word "manufacturing" are to a large extent determined by the object sought to be effected by the enactment in which it appears. For instance, a corporation laundering shirts for a shirt manufacturer has been held to be a manufacturing corporation within the bankruptcy act. *In re Troy Steam Laundering Co.* 132 Fed. 266. A laundry was excluded from a zoning district which permitted light manufacturing therein because the business was held to be more than light manufacturing and a manufacturing business as defined in another section of the zoning ordinance. *Lowenthal* v. *Bratt,* 135 N. J. L. 572. It was held in *Commonwealth* v. *Keystone Laundry Co.* 203 Pa. 289, that a laundry corporation was not entitled to an exemption from a local tax upon its machinery because it was not a manufacturing corporation. Thus we see that the identical process of laundering has been considered a manufacturing or a nonmanufacturing process depending almost entirely upon the object of the legislative measure in which the term manufacturing was used.

The business conducted by Palmer & Parker Company is disclosed by the record. There is little, if any, resemblance between the mahogany logs and the veneer. The veneer differs entirely from the raw material in form and appearance. It is adapted to a new and particular use for which only portions of some of the logs could be used and then only if they were subjected to the processes employed by the company. The resulting product has a new name. The company has processed pieces of mahogany wood to such an extent that nothing further can or need be done to make the veneer a finished product or to make it an article of trade and commerce readily saleable in the open market in the condition in which it was put by the company. The work done upon the mahogany wood has progressed so far in the production of the veneer that this product can be used only for the limited purposes for which veneer is commonly used, and the company may properly be said to

manufacture veneer in the same sense that a lumber company, which has gone so far in the fabrication of its lumber as to produce material primarily intended and especially fashioned for some particular use or actually to convert the material into window sashes, interior trim or doors, may be said to be a manufacturer of the especially fashioned material or of the sash, trim or doors. *Boston & Maine Railroad* v. *Billerica*, 262 Mass. 439, 446. *Tide Water Oil Co.* v. *United States*, 171 U. S. 210, 217. *United States* v. *Dudley*, 174 U. S. 670, 673. Fabrication of lumber effecting a much lesser change between the timber and the resulting product than has been effected in the instant case has been held to constitute manufacturing. *Bogard* v. *Tyler's Administrator*, 119 Ky. 637. *State* v. *A. W. Wilbert's Sons Lumber & Shingle Co.* 51 La. Ann. 1223. *Drennan* v. *Stone*, 190 Miss. 874. *Iden* v. *Bureau of Revenue*, 43 N. M. 205. *Commonwealth* v. *Keystone Bridge Co.* 156 Pa. 500. *Benedict Bros.* v. *Davidson County*, 110 Tenn. 183. Of course, it will be necessary for the purchaser to glue or otherwise attach the veneer to some object of which it is to furnish the exterior finish, and it may be necessary for him to cut it to get the dimensions or shapes he desires, but nothing need be done to change the nature or substance of the veneer itself. A shoe manufacturer has to cut or shape the leather to meet his needs or to put a new gloss on it, but the leather as it left the tannery was a finished product in the same respect as is the veneer made and sold by the company. The skins sold by the tanner are hides made into a finished product, and the veneer made by the company is mahogany wood made into a finished article. The transformation from mahogany logs into veneer is much more than sawing logs into lumber, a process concerning which a doubt was expressed as to whether it constituted manufacture in *Ingram* v. *Cowles*, 150 Mass. 155. It is to be noted that that case did not deal with a tax exemption statute, and that the object of the statute there involved differs from that of the statutes in question.

In the instant case twenty per cent of the company's

business consisted of making veneer which we hold was a manufacturing process and the company, being engaged in manufacturing to this extent, is a manufacturing corporation. *Commissioner of Corporations & Taxation* v. *Assessors of Boston,* 321 Mass. 90. *Assessors of Boston* v. *Commissioner of Corporations & Taxation,* 323 Mass. 730. There was error in the decision of the Appellate Tax Board that it was a domestic business and not a domestic manufacturing corporation.

The Salada Tea Company contends that the various operations conducted by it in the preparation of tea constitute manufacturing. It is true that its principal business is the preparation and sale of tea. We need not decide whether the preparation of the tea constitutes manufacturing. Of course a company whose principal business is manufacturing is entitled to be classified as a manufacturing corporation; but it does not follow that, where its principal business is nonmanufacturing, it is not entitled to classification as a manufacturing company if in the actual conduct of its business it also conducts manufacturing to an extent far greater than that which is merely trivial or only incidental to its principal business. *Commissioner of Corporations & Taxation* v. *Assessors of Boston,* 321 Mass. 90, 96–97. *Assessors of Boston* v. *Commissioner of Corporations & Taxation,* 323 Mass. 730.

The company was engaged in producing tea bags as receptacles for its tea. A large proportion of its capital was invested in the production of these tea bags. A large part of its operative costs was incurred in these operations. Thirty-five machines were used in producing these tea bags. Laying to one side the forming of the boxes out of the folded cut up cardboard as containers of both tea bags and packaged tea, enough remains to show that the making of the tea bags constituted a large and important branch of the company's business. The company was in fact a large scale manufacturer of tea bags. The company had to pack its tea in order to distribute it to its consumers. There was a demand for tea packed in tea bags. This

demand would have to be complied with if the company wished to retain its business. It is inconceivable that it would have gone to such an expense in packing tea in these receptacles unless the trade demanded it, and the fact that such large quantities were so packed and sold is further evidence that there was great demand for tea so packed. The packing of the tea therefore was just as necessary a part of the company's business as was any one of its other operations. If we assume, as the assessors contend, that the mere packaging of goods does not constitute manufacturing, although see *Burke* v. *Stitzel-Weller Distillery,* 284 Ky. 676, the point here involved is not the packaging of goods considered apart from the setting in which the packaging was done. Here the company itself was the manufacturer of the tea bags, and the making of these receptacles comprised a large and an essential branch of the corporate business.

The manufacture of tea bags by machinery to the extent disclosed by the record in the conduct of its business entitled the company to be classified as a foreign manufacturing company. The Appellate Tax Board was in error in deciding that it was not.

The decisions of the Appellate Tax Board were wrong, and in each case the decision must be for the commissioner.

*So ordered.*