WILLIAM F. SULLIVAN & CO., INC. *vs.* COMMISSIONER OF
REVENUE.

Suffolk. September 9, 1992. - November 3, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & GREANEY, JJ.

*Taxation*, Manufacturing corporation. *Words*, "Manufacturing."

Where findings of the Appellate Tax Board showed that a taxpayer con-
ducting a scrap metal processing operation was engaged in an essential
and integral part of the manufacturing of steel, the taxpayer was, as
matter of law, entitled to treatment as a manufacturing corporation for
purposes of G. L. c. 59, § 5, Sixteenth (3), and G. L. c. 63, § 38C.
[578-581]

APPEAL from a decision of the Appellate Tax Board.
The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.
*David Reichert* of Ohio (*Gary L. Fialky & Paul H.
Rothschild* with him) for the taxpayer.
*Daniel W. Halston*, Assistant Attorney General, for the
Commissioner of Revenue.
NOLAN, J. Once again this court is called on to determine
whether a particular business, in this case a scrap-metal
processor, is engaged in "manufacturing" as that term is
used in G. L. c. 59, § 5, Sixteenth (3) (1990 ed.)[1] and G. L.
c. 63, § 38C (1990 ed.).[2] The dispute arose as follows: In
July, 1985, the taxpayer, William F. Sullivan & Co., Inc.
(Sullivan), filed Form 355Q, "Statement Relating to Manu-

---

[1]Clause Sixteenth (3) provides that the machinery of domestic manufac-
turing corporations shall be exempt from local taxation.

[2]General Laws c. 63, § 38C (1990 ed.), provides in pertinent part:
"Every corporation organized under or subject to chapter one hundred and
fifty-six B which is engaged in manufacturing . . . shall for the purposes of
this chapter be deemed to be a domestic manufacturing corporation . . . ."

facturing Activities," with the Commissioner of Revenue (commissioner) requesting classification as a manufacturing corporation. Sullivan sought the manufacturing classification to qualify for certain exemptions from local taxation. The commissioner denied Sullivan's request. On appeal, following a site visit and a hearing, the Appellate Tax Board (board) sustained the commissioner's refusal to classify Sullivan as a manufacturing corporation. Sullivan appealed to the Appeals Court (G. L. c. 58A, § 13 [1990 ed.]), and we took the case on our own motion (G. L. c. 211A, § 10 [A] [1990 ed.]).

We have before us the findings of fact and report, and the opinion of the board. From these we learn that Sullivan is a Massachusetts corporation with its principal place of business in Holyoke.[3] Sullivan employs nineteen persons and, in 1986, sold processed scrap to about fifteen, mostly out-of-State, customers. In 1986, Sullivan's receipts from the sale of scrap totalled more than $2,300,000. Sullivan annually purchases approximately 50,000 tons of scrap metal from about 1,000 individuals and businesses within a sixty-mile radius of the processing facility.[4] The scrap metal typically consists of pipe, boilers, plumbing fixtures, farm machinery, industrial scrap chips, automobile parts, I-beams, air conditioners, refrigerators, washing machines, and stoves. When the scrap arrives at the processing yard, "[u]nwanted waste" is removed and discarded. The scrap metal is then separated and graded as to metallic content. Next, ferrous and nonferrous metals are separated: some of the work is done by hand but most is accomplished by electromagnetic separation. Some of the scrap is dismantled and cut into various sizes utilizing saws, torches, and other tools.[5] After separation, the

---

[3]Sullivan also operates a steel service center where new steel for use in construction is bought and sold. The steel service center is not at issue in this appeal.

[4]Of the total tonnage, about 3,000 tons are nonferrous (aluminum, copper, and brass) and 47,000 tons are ferrous.

[5]The board found that Sullivan has invested $3,000,000 in scrap processing equipment including "a Harris hydraulic shear, a Dempster baling press, an Economy upstroke baler, a loose hydraulic baler, four hy-

scrap is sent either to an hydraulic shear, which cuts the scrap to specified lengths, or to a baler, which compresses the scrap into cubes. Sullivan also uses a wire-stripping machine to remove the insulating jacket from metal cable. After the cable is stripped of its insulating jacket, the cable is cut to shorter lengths, baled, and sold.

With processing complete, the scrap is then sold to consuming steel mills and foundries. Customers specify the grade of scrap desired using standard industry designations.[6] The gradations of scrap sold must conform to industry specification as to size and metallurgical content. If, after delivery and inspection, the scrap fails to conform to industry specification, it is either downgraded, and sold at a reduced price, or rejected.

There is no dispute regarding the board's findings of fact. The sole question is whether the board erred, as a matter of law, in concluding that Sullivan was not engaged in manufacturing. *Franki Found. Co.* v. *State Tax Comm'n*, 361 Mass. 614, 615 (1972). On the board's findings, we conclude that Sullivan's operations are, as a matter of law, of a manufacturing nature. Accordingly, we reverse the board's decision.

This court, on prior occasions, has noted the difficulty in determining whether a corporation's activities constitute "manufacturing" as that term is used in the exemption statutes.[7] See *Southeastern Sand & Gravel, Inc.* v. *Commis-*

---

draulic cranes with magnet attachments, two metal shears, a Marvel Band saw, and a cable stripper."

[6]For example, a customer may request a certain quantity of "No. 1 heavy melting steel" which is defined as "[w]rought iron and/or steel scrap ¼ inch and over in thickness. Individual pieces not over 60 x 24 inches (charging box size) prepared in a manner to insure compact charging." Institute of Scrap Iron and Steel Handbook 7 (1985).

[7]The exemption statutes at issue here concern domestic manufacturing corporations. See notes 1 and 2, *supra*. Similar difficulty exists with regard to foreign manufacturing corporations as analogous exemption provisions exist for them. See G. L. c. 59, § 5, Sixteenth (5) (1990 ed.); G. L. c. 63, § 42B (1990 ed.). See also *Tilcon-Warren Quarries Inc.* v. *Commissioner of Revenue*, 392 Mass. 670, 670 nn.1, 2 (1984).

*sioner of Revenue*, 384 Mass. 794, 795 (1981) (" 'manufac-turing' is chameleon-like in the different definitions given to it"). "The language of the statute[ ] . . . affords little aid in the classification of corporations for, in so far as pertinent, the statute [ ] merely state[s] that a corporation which is engaged in manufacturing shall be deemed to be a manufac-turing corporation." *Assessors of Boston* v. *Commissioner of Corps. & Taxation*, 323 Mass. 730, 740 (1949). Given the less than illuminating statutory definition, we have said that "the Legislature should be supposed to have adopted the common meaning of the word." *First Data Corp.* v. *State Tax Comm'n*, 371 Mass. 444, 447 (1976). To this end, our decisions have embraced the basic concept of manufacturing articulated in *Boston & Me. R.R.* v. *Billerica*, 262 Mass. 439, 444-445 (1928): "[C]hange wrought through the appli-cation of forces directed by the human mind, which results in the transformation of some preexisting substance or element into something different, with a new name, nature or use." See *Tilcon-Warren Quarries Inc.* v. *Commissioner of Reve-nue*, 392 Mass. 670, 672 (1984) (quoting same language).

Notwithstanding our attempt to define manufacturing for the purposes of applying the subject statutes, we have said that the phrase "engaged in manufacturing" should not be given a narrow or restricted meaning. *Joseph T. Rossi Corp.* v. *State Tax Comm'n*, 369 Mass. 178, 181 (1975). Further we have said that "[t]he statutes granting exemption . . . must be fairly construed and reasonably applied in order to effectuate the legislative intent and purpose to promote the general welfare of the Commonwealth by inducing new in-dustries to locate here and to foster the expansion and devel-opment of our own industries, so that the production of goods shall be stimulated, steady employment afforded to our citi-zens, and a large measure of prosperity obtained." *Assessors of Boston* v. *Commissioner of Corps. & Taxation, supra* at 741. Accordingly, in *Assessors of Boston*, and later in *Rossi*, we held that "processes which themselves do not produce a finished product for the ultimate consumer should still be deemed 'manufacturing' for the purposes of this tax exemp-

tion so long as they constitute an essential and integral part of a total manufacturing process." *Joseph T. Rossi Corp.* v. *State Tax Comm'n, supra* at 181-182.

Sullivan relies on *Assessors of Boston* and *Rossi* in arguing that scrap processing is an essential and integral part of the manufacturing of steel, thereby causing Sullivan to fall within the ambit of the manufacturing exemption. In *Assessors of Boston* v. *Commissioner of Corps. & Taxation, supra* at 748, we found that the "scouring of wool is an essential and integral part of the manufacturing of textiles" in holding that the wool scouring operation qualified for the exemption. In reaching this conclusion, we rested on the multiplicity of processes to which the wool was subjected before it was bagged and shipped to the customer.[8] In *Rossi*, we found that the taxpayer's sawmill operation was an essential and integral part of the manufacturing process in holding that it qualified for the exemption. Rossi harvested trees, debarked logs, sawed, and resawed the timber to produce lumber. We stated that Rossi's operations "convert[ed] [standing timber] into cut lumber of different sizes, a product more refined and

---

[8]We described the wool scouring process at issue in *Assessors of Boston* v. *Commissioner of Corps. & Taxation*, 323 Mass. 730, 736-737 (1949), as follows: "If the wool when received is not in condition for scouring because it contains a slightly excessive amount of foreign matter, it is fed into a dusting machine; or if it is matted it is put into a breaker machine; or if heavily matted it is put into a machine known as the tag breaker. Wool containing burrs is treated by a burr picking machine, and if the wool is not then relatively free from burrs it is carbonized by submerging it into a solution of sulphuric acid. When the wool is ready for scouring, it is put upon a conveyor belt, studded with pins, which catches the wool and raises it upward while it is combed out and evened off by a toothed rake, and it is finally deposited in a vat in which it is submerged in hot water to which a chemical solution is added and where it is agitated by a series of rakes. The wool is removed from this vat and the water squeezed out, and it is again submerged in a second vat in a solution of water and another chemical compound. It is then removed and treated in a similar manner in a third vat. It is finally conveyed to a fourth vat known as the rinsing or bleaching vat where it is again submerged in water to which a bleaching solution is added if the customer desires the wool to have a certain color. The wool is removed from this vat, dried, bagged and shipped to the customer, and it is ready for carding and spinning into thread, cloth or rugs."

specialized in use than the raw material." *Joseph T. Rossi Corp.* v. *State Tax Comm'n, supra* at 182.

While the process under study in this case, like the process at issue in *Rossi*, falls close to the line between manufacturing and nonmanufacturing activities, we hold that Sullivan's scrap processing operation qualifies for the exemption. In our view, Sullivan's operation produces a similar degree of change and refinement to the source material as did the processes at issue in the wool scouring case and in *Rossi*.

This is not to say, however, that every process comprising the first step, or a step, in the transformation of some source material into a finished product qualifies as a process which is an essential and integral part of the total manufacturing process as that phrase has been used in our cases. See *Assessors of Boston* v. *Commissioner of Corps. & Taxation, supra* at 748. To constitute an essential and integral part of the total manufacturing process and to qualify for the exemption, the process under study must effect the kind of change and cause a correlative degree of refinement to the source material as exemplified by the taxpayers' operations in the wool scouring case, *Rossi*, and now, Sullivan's scrap processing operation. The undefinable nature of the operative terms in these exemption cases necessitates case-by-case, analogical development of their meaning. Absent legislative instruction, we know of no better direction in which to proceed.

The briefs of both parties cite decisions of other jurisdictions on the issue whether scrap metal processing constitutes manufacturing. The parties point to similarities and differences in the facts and the statutes of the referenced cases and the case now before us. While we have in the past buttressed our decisions by way of reference to the decisions of other jurisdictions, see *Tilcon-Warren Quarries Inc.* v. *Commissioner of Revenue, supra* at 673, prior decisions on this point have been based, to the extent that research reveals, "on our determination of the legislative intent as indicated by the history, objectives and language of the statutes involved . . . uninfluenced by decisions of other jurisdictions." *Franki Found. Co.* v. *State Tax Comm'n, supra,* at 621. See

*Westinghouse Broadcasting Co.* v. *Commissioner of Revenue*, 382 Mass. 354, 358 (1981). Our decision rests on the same basis.

Accordingly, the decision of the Appellate Tax Board is reversed.

*So ordered.*