NOREAST FRESH, INC. *vs.* COMMISSIONER OF REVENUE.

No. 98-P-1917.

Suffolk. February 22, 2000. - October 27, 2000.

Present: ARMSTRONG, C.J., KAPLAN, & PERRETTA, JJ.

*Taxation,* Exemption. *Statute,* Construction. *Words,* "Engaged in manufacturing."

This court concluded that a food processing corporation's production of pack-
aged salads and vegetables constituted, in the circumstances, "manufactur-
ing" within the meaning of G. L. c. 63, § 38C, such that, for tax year
1995, its production machinery was exempt from local property taxation.
[354-358]

APPEAL from a decision of the Appellate Tax Board.

*Raymond T. Mahon* for the taxpayer.

*Peter T. Wechsler,* Assistant Attorney General, for the Com-
missioner of Revenue.

ARMSTRONG, C.J. Noreast Fresh, Inc. (Noreast), a Mas-
sachusetts corporation, applied to the Commissioner of Revenue
(commissioner) to be classified under G. L. c. 63, § 38C, as
"engaged in manufacturing" for the 1995 tax year, a designa-
tion that would exempt its machinery from local property
taxation. See G. L. c. 59, § 5, Sixteenth; *Fernandes Super Mkts.,
Inc.* v. *State Tax Commn.,* 371 Mass. 318, 319 (1976); *York
Steak House Sys., Inc.* v. *Commissioner of Rev.,* 393 Mass. 424,
424-425 (1984). The commissioner refused, and on review under
G. L. c. 58, § 2, the Appellate Tax Board (board), after an evi-
dentiary hearing, upheld the commissioner's decision on the
basis that Noreast's production of packaged salads and veget-
ables did not effect sufficient change to the raw ingredients to
be called "manufacturing" in the statutory sense. Noreast
appealed.

The facts are not in controversy. Noreast's operations in

1995[1] occupied 23,500 square feet of commercially leased floor space[2] in Everett, where the company produced, from raw vegetables grown by others, a variety of prepackaged products for sale to retail supermarket chains in New England and the mid-Atlantic states. Among them, and immediately usable by consumers without further processing, were coleslaw (a mixture of cabbage and carrots), several types of salad,[3] spinach, celery hearts, carrot sticks, and broccoli and cauliflower florets.[4]

Typical of the highly mechanized production process was that resulting in the "classic" salad. First, unprocessed whole heads of lettuce arrived in bulk. On the "lettuce line," machinery removed the cores of the heads, and workers peeled off the outer "wrapper" leaves. So refined, the lettuce then passed through a machine that shredded it into small uniform pieces. These physical alterations were followed by a chemical treatment designed to sanitize and preserve the product: the lettuce was bathed in water that had been cooled (by large industrial plate chillers) to thirty-five degrees Fahrenheit and to which chlorine and citric acid had been added. The chlorine destroyed bacteria living in the product; the citric acid adjusted acidity to a level ideal for the chlorine to act. Meanwhile, raw carrots were processed by "tipping and topping" (i.e., cutting the ends off), peeling, and shredding. Similarly, whole heads of red cabbage were cored, peeled, and shredded. After the shredded cabbage and carrots were bathed as above,[5] they were mixed with

---

[1] The commissioner does not press on appeal his objection before the board to the admission in evidence of events after January 1, 1995, the date to which his classification relates. See G. L. c. 58, § 2; 830 Code Mass. Regs. § 58.2.1(6)(a)(1999).

[2] By contrast, Noreast's nonproduction activities (e.g., administration and accounting), occupied only 2,800 square feet.

[3] The salads included the following: "spring mix," a combination of eleven varieties of items grown in California; "classic" salad, a mixture of iceberg lettuce, red cabbage and carrots; "European" salad, made up of cut romaine lettuce, iceberg lettuce, escarole, radicchio, and frisée; and "Caesar" salad, which was bagged along with packaged dressing and croutons.

[4] Spinach accounted for over half of Noreast's $8.9 million in gross receipts for 1994 and thirty-five per cent of its $17.9 million in gross receipts for 1995. Sales of celery, carrot sticks, broccoli and cauliflower comprised one-third of its receipts in 1994, and less than ten per cent in 1995. The proportion of business from Noreast's salad lines increased from ten per cent in 1994 to sixty per cent in 1995.

[5] At least with regard to carrots, a second purpose of the citric acid was to prevent them from whitening.

the lettuce and the resulting salad was spun in a centrifugal dryer, flushed with nitrogen gas, and weighed on a computerized scale. A mechanical system then enclosed the salad portions in bags it fabricated from sheet roll stock made of a breathable plastic film designed to extend product shelf-life. Finally, the bagged salads passed through a metal detector and were packed in ice for shipping. Noreast generated its other products in much the same way, with insignificant variations.[6]

As suggested above, Noreast's operations used an array of expensive industrial machinery and equipment. In 1993, it leased $250,000 in such items from the prior occupant of its facility, and elsewhere purchased roughly $375,000 in similar articles. Noreast added another $1.5 million in machinery and equipment in 1994 as it modified its product lines to include salads, and in 1995 made like purchases costing an additional $1.9 million. The unrefuted testimony was that the equipment bought in 1995 was put in service by September of 1994.

In 1994, Noreast's workforce consisted of 102 persons, 87 of whom took part in production activities. The number of employees increased in 1995 to 259, of whom 254 were engaged in production. Of the total compensation paid by Noreast, in 1994 eighty per cent was for production workers, and in 1995 that figure was eighty-six per cent.

*Discussion.* To merit the desired "manufacturing" label under G. L. c. 63, § 38C, and G. L. c. 58, § 2, a corporation must engage in activities properly called "manufacturing" and "substantial" in relation to the whole of its operations. See *Fernandes Super Mkts., Inc.* v. *State Tax Commn.*, 371 Mass. at 320, 322. Focusing only on the first requirement, the board ruled that Noreast was not "manufacturing" because "[i]n all of [Noreast's] product lines, the vegetable ingredients it used were identifiable constituents of the finished product. . . . Moreover, [these] vegetables are edible without having to undergo mechanized processing operations like [Noreast's]. . . . [Noreast's] activities including cutting, chilling, combining, and

---

[6]In its "cut-up line," carrot sticks were produced in a manner similar to the shredded carrots, except that the tipped, topped, peeled carrots were mechanically cut into sticks by being propelled at about sixty miles per hour through a mesh screen. Also on that line, bunches of broccoli and cauliflower were cut into florets. On the "celery line," celery hearts (i.e., sticks) were produced by a machine that cut the raw celery heads with laser beam-like high speed water pressurized to 50,000 pounds per square inch. Processing on the "spinach line" involved grading and de-stemming rather than shredding or cutting.

packaging vegetables did not change the vegetables into new commodities distinct from the initial ingredients."

To give meaning to a legislatively undefined term, the "decisions have embraced the basic concept of manufacturing articulated in *Boston & Me. R.R.* v. *Billerica*, 262 Mass. 439, 444-445 (1928): '[C]hange wrought through the application of forces directed by the human mind, which results in the transformation of some preexisting substance or element into something different, with a new name, nature or use.' See *Tilcon-Warren Quarries Inc.* v. *Commissioner of Revenue*, 392 Mass. 670, 672 (1984) (quoting same language)." *William F. Sullivan & Co.* v. *Commissioner of Rev.*, 413 Mass. 576, 579 (1992). While simple to state, the concept is elusive in application, yielding an abundance of reported decisions. See *Commissioner of Rev.* v. *Houghton Mifflin Co.*, 423 Mass. 42, 44 & n.4 (1996) (collecting cases). At bottom, the proper mode of analysis is of the "case-by-case, analogical" variety. *William F. Sullivan & Co.* v. *Commissioner of Rev.*, 413 Mass. at 581.

Several opinions have considered how properly to categorize the output of various foodstuffs. On the manufacturing side of the ledger sit such operations as baking pastry and breads, making jellies, jams, and peanut butter, producing from livestock sausages, lard, and cured bacon and hams, see *Commissioner of Corps. & Taxn.* v. *Assessors of Boston*, 321 Mass. 90, 91-92 (1947), making bottled soft drinks by adding syrup and carbon dioxide to water, preparing coffee by cleaning, blending, roasting, and grinding the beans, and making fruit syrups, chocolate milk, ice cream, and cheeses, see *Assessors of Boston* v. *Commissioner of Corps. & Taxn.*, 323 Mass. 730, 741-744 (1949). In the other column are nonmanufacturing activities such as one restaurant's thawing and cooking of frozen steaks that were processed out-of-State, see *York Steak House Sys., Inc.* v. *Commissioner of Rev.*, 393 Mass. at 425-426, or another's cooking and assembly of the constituent parts of hamburgers, chicken and fish sandwiches and other fast-food items, see *McDonald's Restaurants of Mass., Inc.* v. *Commissioner of Rev.*, 393 Mass. 1008, 1008-1009 (1985).

Here, the degree of change to the raw vegetables seems to fall between the two poles represented above. While not as transformative a process as making sausages from livestock or bread from flour, Noreast's efforts produce far more of a metamorphosis than appears in the restaurant cases. Pushing

Noreast's activities in the direction of manufacturing is the dictum in *Assessors of Boston* v. *Commissioner of Corps. & Taxn.*, 323 Mass. at 742, that the canning of corn and peas falls in that category. In so saying, the Supreme Judicial Court cited with approval, among others, the case of *County Commrs. of Carroll County* v. *B. F. Shriver Co.*, 146 Md. 412 (1924), which held to be manufacturing for purposes of a statute similar to ours the process of mechanically removing corn kernels from husk and cob, canning in brine, and cooking to kill the bacteria in the corn. *Id.* at 413-418. Those processes mirror the ones used here, the only differences being ones without import — the use of heat rather than chemicals for sterilizing, and the use of cans instead of bags for packaging.

In this area of law, in which future certainty rests not on legislative specification but on analogy, it is appropriate to adhere to the guidance of *Assessors of Boston* v. *Commissioner of Corps. & Taxn.*, 323 Mass. at 748-749, that "[t]he words 'engaged in manufacturing' are not to be given a narrow or restrictive meaning," and to conclude that Noreast is engaged in manufacturing. That result conforms both to the "broad purpose of the statute to be a promotion of the general welfare by inducing new industries to locate in Massachusetts and by fostering an expansion and development of our own industries," *Joseph T. Rossi Corp.* v. *State Tax Commn.*, 369 Mass. 178, 181 (1975), and to the principles that "the statute should be construed, if reasonably possible, to effectuate this legislative intent and purpose . . . ." *Ibid.*

Precedents not involving food products offer further support for that result. The degree of refinement by Noreast's operations compares favorably to that in *William F. Sullivan & Co.* v. *Commissioner of Rev.*, 413 Mass. at 577-578, where manufacturing included the processing of scrap metal for sale to foundries by removing unwanted waste, separating, grading, cutting and baling or compressing, and in *Joseph T. Rossi Corp.* v. *State Tax Commn.*, 369 Mass. at 179, where a sawmill operator that cut down trees, stripped bark, and sawed and edged the wood into lumber, was manufacturing. Both the commissioner and the board liken Noreast's case to *Tilcon-Warren Quarries Inc.* v. *Commissioner of Rev.*, 392 Mass. at 671-673, which held that the taxpayer's quarrying, crushing, and separating of rock into various sizes of stones and sand was not manufacturing. See *Southeastern Sand & Gravel, Inc.* v. *Commissioner of Rev.*, 384

Mass. 794, 795-796 (1981) (gravel crushing and size screening not manufacturing). Similarly, the argument goes, Noreast merely cut vegetables into smaller sizes and, as with the blending of sand, simply mixed them.[7] We reject the analogy, however, as it ignores critical features of Noreast's procedures, such as the excision of parts of the raw materials unsuitable for use, the changes brought about through chemical sanitation, and the manufacturing of special packaging for the final product.[8]

The board and the commissioner emphasize that the vegetables are edible even before processing by Noreast, and that they are still the same vegetables thereafter. These factors are not controlling. First, if they were, the canning of peas and corn, the making of jellies and jams, and the curing of bacon and hams would not have qualified as manufacturing. Second, if identifiability were the test, then the processing of wood in *Rossi, supra,* and of metal in *Sullivan, supra,* also would not pass. Viewing Noreast's vegetable operation as a whole, "[w]e think the transformation wrought by [its] processes has, as a practical matter, resulted in a new article and a new use, even though the name of the raw material still is retained." *Assessors of Boston* v. *Commissioner of Corps. & Taxn.,* 323 Mass. at 742.

Finally, the commissioner requests that if Noreast's vegetable processing is found to be manufacturing, we should remand the case to the board for a determination as to the "substantiality" of those operations. See *Fernandes Super Mkts., Inc.* v. *State Tax Commn.,* 371 Mass. at 322. However, no purpose would be served by such a remand, because a finding of substantiality is inevitable. It is abundantly clear from the undisputed evidence

[7]One thread of reasoning expressed in *Tilcon-Warren Quarries, Inc., supra,* was that the process appearing there was "more akin to mining than to manufacturing." 392 Mass. at 673. By contrast, no similar alternative nomenclature suggests itself as being more naturally applicable to Noreast's activities.

[8]Although neither the board nor the parties have discussed the point, it is probably significant that Noreast manufactured on its premises the special bagging which is integral not only to the retailing but to the preservation of its products. This packaging bears comparison to the tea bags, the production of which alone supported the tea company's manufacturing classification in *Commissioner of Corps. & Taxn.* v. *Assessors of Boston,* 324 Mass. 32, 39-40 (1949), regardless of whether the processing of the tea contained therein was itself manufacturing. We do not rest our decision solely on this factor, but it is a factor properly weighed.

that Noreast's vegetable processing operation is not a mere sideline, but the heart of the corporate business.

For the above reasons, the commissioner should have classified Noreast as engaged in "manufacturing" under G. L. c. 63, § 38C, and G. L. c. 58, § 2, for the 1995 tax year, with tax consequences accordingly.

*Decision of the Appellate Tax
Board reversed.*