NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12083

GENENTECH, INC. vs. COMMISSIONER OF REVENUE.


Suffolk.     October 7, 2016. - January 12, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
Budd, JJ.


Taxation, Corporate excise, Manufacturing corporation.
    Constitutional Law, Taxation, Commerce clause, Interstate
    commerce.


    Appeal from a decision of the Appellate Tax Board.

    The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


    Catherine A. Battin, of Illinois (Richard C. Call also
present) for the taxpayer.
    Brett M. Goldberg (Jamie E. Szal also present) for
Commissioner of Revenue.


    BOTSFORD, J.  Under the Massachusetts corporate excise tax

statute, G. L. c. 63, corporations that generate business income

in Massachusetts and other States pay taxes on that income

according to a statutory formula that seeks to apportion and tax

the corporation's income generated in the Commonwealth.

Beginning in 1996, for a "manufacturing corporation," the apportionment formula has been based solely on the corporation's sales, see G. L. c. 63, § 38 (l), inserted by St. 1995, c. 280, § 2. The taxpayer Genentech, Inc., is a Delaware corporation with a principal place of business in California and earns business income in the Commonwealth as well as other States. In this appeal from a decision of the Appellate Tax Board (board), Genentech challenges the board's determination that it qualified as a manufacturing corporation for the tax years 1998 through 2004 (tax years at issue); it also challenges the board's rejection of its claim that application of § 38 (l)'s single-factor apportionment formula based on sales to the company violated the commerce clause of the United States Constitution. We affirm the decision of the board.

Facts. We summarize the findings of fact made by the board. See G. L. c. 58A, § 13 ("The decision of the board shall be final as to findings of fact"). Genentech is a biotechnology company that develops drugs derived from proteins produced by living cells. Through a four-step process, Genentech employees modify the genetic codes of living cells to produce "proteins of interest" with desired pharmacologic effects.[1] First, Genentech scientists and other employees alter the deoxyribonucleic acid

---

[1] Genentech's four-step process transforms the living cells into insulin, human growth hormone compounds, and a drug used for cancer treatment.

(DNA) of the selected cells to instruct them to produce a specific "protein of interest."  Second, employees facilitate the production of the protein of interest by placing the genetically altered cells in successively larger tanks to enable growth and feeding them glucose and other nutrients while closely monitoring their environment.  Third, the protein of interest is purified by separating it from the mix of cells and other material present through ultrafiltration and chromatography; Genentech must extract the protein from some cells by "disrupting" or breaking down the cell walls containing them.  Finally, following the purification process, Genentech employees formulate the resulting bulk drug into its final dosage form, and package it for sale to distributors or directly to physicians, hospitals, and pharmacies around the world.

On the financial side of Genentech's operations, the company invests excess cash in short-term securities -- money market funds, commercial paper, and treasury bonds.  From two to seven employees working in Genentech's treasury department conduct a daily assessment of Genentech's cash needs and then liquidate short-term investments to free up cash or invest excess cash in short-term securities, as necessary.  Money market funds are pooled investment vehicles that aim to maintain a consistent net asset value of one dollar per share. Consequently, investors generally expect to be able to redeem

their shares for the amount originally invested, while also earning interest or dividends through the term that they hold shares in the money market fund. During the tax years at issue, the money market funds held in Genentech's accounts maintained a one dollar net asset value, thus allowing Genentech to redeem them for the purchase price.[2]

Genentech's receipts pertaining to the transactions involving the short-term assets held in a number of Genentech's separate accounts in Mellon Bank established there were no capital gains or losses generated during the tax years at issue;[3] Genentech thus was able to either redeem the securities in every instance for the same amount as it paid for them, or hold the securities to maturity. Genentech did not include the proceeds it received from the redemption of its short-term securities in the statement of its revenue for purposes of the company's financial statements, in the computation of gross receipts reported on its Federal corporate income tax return that was

---

[2] The board defined commercial paper as "a short-term debt instrument that is usually issued by a corporation in order to meet working capital needs as an alternative to a bank loan." The board did not further discuss commercial paper in its decision, and did not discuss treasury bonds at all beyond stating that they were a form of short-term security in which Genentech placed funds.

[3] Genentech maintained eleven accounts holding short-term assets at Mellon Bank, and Mellon Bank was responsible for keeping the records of all deposits, withdrawals, sales and purchases of securities, redemptions, and receipt of interest and dividends; Genentech did not keep its own records.

used to determine its taxable income, or in the total of its receipts used to compute sales factor apportionment in filling out the company's California excise tax returns.

Procedural history.  For the tax years 1998 through 2003, Genentech filed its Massachusetts corporate excise returns using the three-factor apportionment formula based on property, payroll, and sales that applies to most general business corporations.  See G. L. c. 63, § 38 (c).[4]  For the 2004 tax year, Genentech originally filed its Massachusetts corporate excise tax return using the single-factor apportionment formula applicable to manufacturing corporations, but later filed an application for abatement, claiming that it was not substantially engaged in manufacturing and thus should have been entitled to apportion its income on the standard three-factor basis.

The commissioner of revenue (commissioner) issued four notices of assessment to Genentech, taking the position that

---

[4] As discussed infra, through 1995, G. L. c. 63, § 38, applied the three-factor apportionment factor set out in § 38 (c) to manufacturing corporations.  See G. L. c. 63, § 38, as amended through St. 1988, c. 202.  The 1995 amendment to § 38 added § 38 (k) and (l), which established different apportionment formulas for "defense corporations" and "manufacturing corporations," respectively, see St. 1995, c. 280, § 2, and, as relevant to the tax years at issue in this case, § 38 (l) was amended in 1996, see St. 1996, c. 151, § 209. The formula for manufacturing corporations is a single-factor formula based solely on the corporation's sales factor.  See G. L. c. 63, § 38 (l).

Genentech was engaged in substantial manufacturing activity for all the tax years at issue and thus required to use the single-factor apportionment formula in § 38 (l).  Genentech filed several applications for abatement, all of which the commissioner denied.  Genentech timely filed petitions under formal procedure with the board for each denial.  The board ruled that Genentech was engaged in manufacturing for purposes of § 38 (l), that its manufacturing activities were "substantial[]," as required by § 38 (l), and that application of the single-factor apportionment formula to the company did not violate the commerce clause.  Genentech filed a timely appeal, and we transferred the case from the Appeals Court to this court on our own motion.

Standard of review.  "A decision by the board will not be modified or reversed if the decision 'is based on both substantial evidence and a correct application of the law.'" Capital One Bank v. Commissioner of Revenue, 453 Mass. 1, 8, cert. denied, 557 U.S. 919 (2009), quoting Boston Professional Hockey Ass'n v. Commissioner of Revenue, 443 Mass. 276, 285 (2005).  "Because the board is authorized to interpret and administer the tax statutes, its decisions are entitled to deference. . . .  Ultimately, however, the interpretation of a statute is a matter for the courts" (citation omitted).  Onex

Communications Corp. v. Commissioner of Revenue, 457 Mass. 419, 424 (2010).

Discussion. 1. Genentech's manufacturing. During the tax years at issue, a "manufacturing corporation" was defined in § 38 (l) (1) in relevant part as follows:

"In order to be engaged in manufacturing, the corporation must be engaged, in substantial part, in transforming raw or finished physical materials by hand or machinery, and through human skill and knowledge, into a new product possessing a new name, nature and adapted to a new use."[5]

This court has considered whether particular activities conducted by a corporation qualify as "manufacturing" in a number of different factual contexts.[6] We start with the premise that a critical component of manufacturing is "the implication of change wrought through the application of forces directed by the human mind, which results in the transformation of some

[5] The regulations of the commissioner, 830 Code Mass. Regs. § 58.2.1(6)(b) (1999), further provide that the "facts and circumstances of each case" will be examined with various principles serving as guidelines; principle (2), which states that "[i]f the process involves chemical change to property rather than only physical change, it is more likely to be manufacturing," is of particular relevance to this case.

[6] The issue has arisen often in cases involving the exemption from local property taxation for machinery of domestic manufacturing corporations under G. L. c. 59, § 5, Sixteenth (3). See, e.g., William F. Sullivan & Co. v. Commissioner of Revenue, 413 Mass. 576 (1992); Southeastern Sand & Gravel, Inc. v. Commissioner of Revenue, 384 Mass. 794 (1981); Franki Found. Co. v. State Tax Comm'n, 361 Mass. 614 (1972). However, our cases have considered the term "manufacturing corporation" to have the same meaning in the property tax exemption statute as it does in the corporate excise tax statute, G. L. c. 63. See, e.g., William F. Sullivan & Co., supra at 576-577, 579-580.

preexisting substance or element into something different, with a new name, nature or use." Boston & Me. R.R. v. Billerica, 262 Mass. 439, 444-445 (1928). See William F. Sullivan & Co. v. Commissioner of Revenue, 413 Mass. 576, 579 (1992) ("our decisions have embraced the basic concept of manufacturing articulated in Boston & Me. R.R [supra]"); The Charles River Breeding Labs., Inc. v. State Tax Comm'n, 374 Mass. 333, 335 (1978) ("Manufacturing normally involves a change of some substance, element, or material into something new or different").

In cases where this court has determined that a company's activities did not qualify as manufacturing, we have noted the absence of new products "of substantially different character" (citation omitted). Tilcon-Warren Quarries, Inc. v. Commissioner of Revenue, 392 Mass. 670, 673 (1984). In that case, for example, we concluded that extracting rocks from the ground and crushing them into smaller, commercially usable sizes did not involve a change in the material's character necessary to qualify as manufacturing. See id. at 672-673. Similarly, the breeding and raising of partially uncontaminated laboratory animals was determined not to be manufacturing because "[m]anufacturing normally involves a change of some substance, element, or material into something new or different [and] [n]o matter how intricately it is carried on, the production of

partially uncontaminated animals by [the taxpayer] does not fit within this definition" (citation omitted). The Charles River Breeding Labs., Inc., 374 Mass. at 335.

On the other hand, we have found that a multitude of activities fall under the definition of manufacturing. We have held, for example, that a publisher's "compilation of information, photographs, and text, into proofs, edited, refined, and ultimately transferred to disk or CD ROM" is manufacturing because "[t]he disks and CD ROMs possess a new nature and are adapted for a new use, namely the printing and binding of books." Commissioner of Revenue v. Houghton Mifflin Co., 423 Mass. 42, 50-51 (1996). Similarly, the transformation of raw green coffee beans into marketable coffee through roasting, grinding, packaging, and selling is manufacturing, given that "a raw material which was unfit for human consumption or any other practical use" was converted into "a finished product which differed substantially from the raw material in appearance, form and taste, and which was thereby made adaptable to a use for which it otherwise would not be available." Assessors of Boston v. Commissioner of Corps. & Taxation, 323 Mass. 730, 741 (1949).

As in the cases just cited, we conclude that Genentech engages in manufacturing for purposes of § 38. Genentech argues its activities are comparable to mining. Unlike the extraction

and crushing of rocks in the Tilcon-Warren Quarries case, however, Genentech is not merely paring something down to a smaller size.  See 392 Mass. at 673.  Nor do the cells that Genentech develops remain significantly unchanged.  Rather, Genentech scientists and other employees, by hand or machine, implant DNA molecules into a cell to genetically transform the medium to behave in ways other than what its natural genetic code would dictate.  Although the cells may replicate thereafter on their own, each genetically modified and replicated cell is different from the original cell in a most fundamental way.  Moreover, the modified cell itself is far from the final product:  it is the "protein of interest" that Genentech extracts from each of the modified cells and then purifies that serves as the source of each drug that Genentech then markets and sells.

"The words 'engaged in manufacturing' are not to be given a narrow or restrictive meaning."  Assessors of Boston, 323 Mass. at 748-749.  We agree with the board that where such a clear transformation has occurred, Genentech's drug production activities qualify as manufacturing within the meaning of § 38 (l).

2.  Substantial manufacturing and gross receipts.  Under § 38 (l) (1), a corporation engaged in manufacturing only qualifies as a "manufacturing corporation" subject to the

single-factor apportionment formula based on sales in § 38 (l)

(2) if it engages "in substantial part" in manufacturing

activities.  Genentech claims that even if it is engaged in

manufacturing, it still does not qualify as a manufacturing

corporation because it does not satisfy the necessary test for

engaging in "substantial" manufacturing.  The board rejected

Genentech's argument, as do we.

Section 38 (l) (1) sets out five alternative tests for

measuring whether a corporation's manufacturing work is

"substantial," and provides that only one of these tests must be

met.[7]  The parties agree that the first alternative test is the

---

[7] General Laws c. 63, § 38 (l) (1), provides in relevant part:

> "A manufacturing corporation's activities will be considered to be substantial if any one of the following five tests are met:
>
> "1. twenty-five per cent or more of its gross receipts are derived from the sale of manufactured goods that it manufactures;
>
> "2. twenty-five per cent or more of its payroll is paid to employees working in its manufacturing operations and fifteen per cent or more of its gross receipts are derived from the sale of manufactured goods that it manufactures;
>
> "3. twenty-five per cent or more of its tangible property is used in its manufacturing operations and fifteen per cent or more of its gross receipts are derived from the sale of manufactured goods that it manufactures;
>
> "4. thirty-five per cent or more of its tangible property is used in its manufacturing operations; or

most apt to Genentech; the first alternative test requires proof that twenty-five per cent or more of the corporation's "gross receipts are derived from the sale of manufactured goods that it manufactures." Id.

The term "gross receipts" in this first alternative is not defined in § 38 (l). Generally, "where [a] statutory term is not defined, 'it must be understood in accordance with its generally accepted plain meaning.'" Ten Local Citizens Group v. New England Wind, LLC, 457 Mass. 222, 229 (2010), quoting Allen v. Boston Redevelopment Auth., 450 Mass. 242, 256 (2007). Genentech argues that the commonly understood meaning of "gross receipts" is clear (and expansive): the term means the total amount of receipts received, without deduction for expenses or other items. Genentech also urges us to read § 38 (l) in harmony with § 38 (f), which sets out the governing definition of "sales factor" used in all the § 38 allocation formulas, whether three-factor or single-factor. As in effect during the tax years at issue, § 38 (f), inserted by St. 1966, c. 698, § 58, provided in relevant part:

> "The sales factor is a fraction, the numerator of which is the total sales of the corporation in this commonwealth during the taxable year, and the denominator of which is the total sales of the corporation everywhere during the taxable year. As used in this subsection, 'sales' means

---

"5. the corporation's manufacturing activities are deemed substantial under relevant regulations promulgated by the commissioner."

> all gross receipts of the corporation except interest,
> dividends, and gross receipts from the maturity,
> redemption, sale, exchange or other disposition of
> securities" (emphasis added).

Pointing to generally applicable rules of statutory construction, Genentech argues that because "gross receipts" is defined in § 38 (f) with a specific exception for receipts from the redemption or other disposition of securities, whereas no such exception is included in § 38 (l), "gross receipts" in § 38 (l) must be interpreted to include receipts of all transactions involving securities, including redemption and return at maturity. See, e.g., Simmons v. Clerk-Magistrate of the Boston Div. of the Hous. Court Dep't, 448 Mass. 57, 65 (2006) ("[W]here the Legislature has employed specific language in one portion of a statute, but not in another, the language will not be implied where it is absent").

The board did not adopt the analysis Genentech advances here. The board noted the volume of transactions whereby Genentech redeemed and reinvested cash on an almost daily basis, and pointed out that if Genentech's "gross receipts" were defined to include the receipts from the redemption or return at maturity of funds invested in short-term securities, the percentage of the company's "receipts" related to sales involving its drugs and other income-generating transactions was dramatically different, and dramatically lower, than if receipts

from what in substance is a return of capital were omitted.[8]

Using the 2004 tax year as an example, the board pointed out

that if Genentech's interpretation were accepted,

> "[Genentech] would have generated $39,226,839,298 in gross receipts, of which only $4,578,096,817 came from ordinary business income, such as revenue from the sale of drugs, royalties from the license of intellectual property, contract revenue, and investment income in the form of interest, dividends, and capital gains.  The remainder of those 'gross receipts' would have been derived from redeeming money market funds or commercial paper for their cash equivalent, receipts that were not included for accounting purposes in the measures of revenue reported to shareholders or included in the computation of taxable income.  Using these figures as a proxy would mean that approximately 88% of Genentech's overall business activities in 2004 consisted of a handful of employees in the treasury department managing Genentech's day-to-day cash flow."

We agree with the board that such a result is "distortive" of

Genentech's operations, transforming, for Massachusetts

corporate income tax purposes, this self-described biotechnology

---

[8] To include the return of capital initially invested and redeemed would yield the following percentages of sales from manufacturing as compared to excluding the return of capital for the years at issue:

| Year | Percent of Sales from Manufacturing, Return of Capital Excluded | Percent of Sales from Manufacturing, Return of Capital Included |
|---|---|---|
| 1998 | 63.5% | 3.9% |
| 1999 | 74.8% | 4.4% |
| 2000 | 67.7% | 8.3% |
| 2001 | 71.5% | 5.6% |
| 2002 | 82.2% | 7.1% |
| 2003 | 72.7% | 10.2% |
| 2004 | 79.6% | 9.3% |

company with substantial revenue derived from sales of its specialty drugs into essentially an investment business.

Under § 38 (l) (1), gross receipts are considered for purposes of determining whether a company's manufacturing activities are a substantial enough portion of its business to qualify it as a "manufacturing corporation" under the corporate excise tax statute. Interpreting the absence of a specific exception in § 38 (l) (1) for receipts from redemption or return at maturity of securities to mean that the return of all Genentech's capital invested in short-term securities is to be included as part of its gross business receipts runs counter to the reality of Genentech's business and essentially makes no sense. We do not consider the meaning of "gross receipts," as used in § 38 (f), to be plain and unambiguous,[9] but even if it were, this court will not interpret a statute according to the plain meaning of its words where to do so would lead to absurd

---

[9] As noted in Microsoft Corp. v. Franchise Tax Bd., 39 Cal. 4th 750, 763 nn.11, 12 (2006), the California Supreme Court, looking to various other jurisdictions, acknowledged the lack of consensus "over whether in a redemption of securities the full or net price constitutes gross receipts." Id. at 764. It is true that in the Microsoft case, the California court concluded that "gross receipts" as used in the tax statute before it, the Uniform Division of Income for Tax Purposes Act (UDITPA), interpreted the term to include the entire security redemption price. Id. at 758-759. However, that court ultimately relied on a separate provision in UDITPA that provided an alternative method of measuring a business's income to reject the tax result that would flow from applying this definition of "gross receipts" to the company. See id. at 770-771.

or unreasonable results.  See, e.g., <u>Bridgewater State Univ.</u>
<u>Found</u>. v. <u>Assessors of Bridgewater</u>, 463 Mass. 154, 158 (2012),
and cases cited.[10]  The board concluded that the interpretation
advanced by Genentech would have absurd consequences.  We agree,
and further accept and agree with the board's interpretation of
the term "gross receipts" in § 38 (<u>l</u>) (1) to be limited to
receipts relating to business income received by Genentech,
including, insofar as investment income is concerned, interest,
dividends, and capital gains.  Under this interpretation, as
reflected in note 8, <u>supra</u>, it is clear that during all the tax
years at issue, more than twenty-five per cent of Genentech's
gross receipts were "derived from the sale of manufactured goods
that it manufactures."  G. L. c. 63, § 38 (<u>l</u>) (1).  Accordingly,
Genentech qualified in each of these tax years as a
"manufacturing corporation" as defined in § 38 (<u>l</u>) (1), and
under § 38 (<u>l</u>) (2), was required to apportion its income under

---

[10] Almost thirty years elapsed between the time the
definition of "sales factor" in § 38 (<u>f</u>) was enacted, see St.
1966, c. 698, § 58, and the establishment of the single-factor
apportionment test for manufacturing corporations in § 38 (<u>l</u>),
see St. 1995, c. 280, § 2.  In our review of the legislative
history of § 38 (<u>l</u>)'s enactment, we found no indication that the
Legislature did, in fact, intend the definition of "gross
receipts" to include receipts from the redemption or return of
capital invested in securities, and neither party has suggested
otherwise.  The absence of any such indication supports our view
that in the circumstances of this case, it is not appropriate to
follow the rule of statutory construction to which Genentech
points, namely, that the use of specific language in one section
of a statute and its absence in a second section signifies an
intentional omission in the second.

the single-factor formula using solely the statute's sales factor.[11]

3. The commerce clause.[12] Genentech challenges the constitutionality of § 38 (l), arguing that as applied to it, the statute violates the dormant commerce clause of the United States Constitution. See Art. I, § 8, cl. 3, of the United States Constitution. The claim is that application of the statute's single-factor apportionment formula to the company, in combination with the unavailability of what it refers to as the

_____

[11] We have focused here on the first alternative test set out in § 38 (l) (1). The fifth alternative test, which looks at whether the corporation's manufacturing activities "are deemed substantial under relevant regulations promulgated by the commissioner," also is satisfied. The pertinent provisions in regulations that the commissioner has adopted to guide apportionment of income and classification of corporations as manufacturing corporations, see 830 Code Mass. Regs. §§ 63.38.1(10)(b)(3) (2015) and 58.2.1(6)(e) (1999) -- provisions that state in the regulatory text they are to be read together -- interpret "gross receipts" as appearing in § 38 (l) (1) to mean only the interest and dividends earned by a corporation are to be taken into account as a receipt. Given that "gross receipts" is not defined in § 38, we look to the commissioner's regulations and give "substantial deference" to the expertise and statutory interpretation of the agency primarily responsible for administration of the statute. Goldberg v. Board of Health of Granby, 444 Mass. 627, 633 (2005). See Zoning Bd. of Appeals of Amesbury v. Housing Appeals Comm., 457 Mass. 748, 759-760 (2010), and cases cited.

[12] We do not address Genentech's challenge under the equal protection clause of the United States Constitution, because the record indicates that the company did not raise any such claim before the board. See G. L. c. 58A, § 13 ("The court shall not consider any issue of law which does not appear to have been raised in the proceedings before the board").

Commonwealth's "manufacturing credits,"[13] creates a discriminatory and unfair tax burden that contravenes the commerce clause test set out in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977). Genentech's challenge fails.

a. Background. As stated previously, § 38 establishes allocation formulas for determining the amount of a business corporation's net income that is subject to taxation in the Commonwealth. If a corporation's income is subject to income tax only in Massachusetts, one hundred per cent of its net income is taxable here, see § 38 (b), but if the income is taxable in one or more States in addition to the Massachusetts, the portion that is subject to tax here will be determined according to an allocation formula set out in one of the other subsections of § 38. Before § 38 (l) was added to G. L. c. 63 in 1995, the amount of income tax paid by a manufacturing corporation with taxable business income in several States was determined by use of the three-factor apportionment formula in §

---

[13] Genentech defines as "manufacturing credits" the following three tax measures: the investment tax credit (ITC) provided for in G. L. c. 63, § 31A; the research and development credit (R&D credit) in G. L. c. 63, § 38M, and the exemption from local property taxes on machinery in G. L. c. 59, § 5, Sixteenth (3). Genentech focuses solely on the ITC and R&D credit in this appeal, and we do not further discuss the local property tax exemption for machinery. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1978).

38 (c).[14]  See G. L. c. 63, § 38 (c), as amended through St.
1996, c. 264, § 2.  The 1995 amendment to § 38 removed
manufacturing corporations from the class of corporations
subject to the § 38 (c) three-factor apportionment formula and
established the single-factor formula based only on sales.  See
St. 1995, c. 280, § 2.  The single-factor formula was
implemented over four years, beginning in 1996; by the beginning
of 2000, all manufacturing corporations with taxable income in
both Massachusetts and another State were required to apportion
their income using solely the sales factor.  See id.

The "manufacturing credits" to which Genentech refers were
enacted long before § 38 (l) was added to the corporate excise
tax statute.  Thus, the investment tax credit (ITC), G. L.

---

[14] During the tax years at issue here (and at present), the
three-factor formula established by § 38 (c) operates as
follows:  the taxable net income of the corporation was
apportioned "by multiplying [the corporation's taxable net
income] by a fraction, the numerator of which is the property
factor plus the payroll factor plus twice times the sales
factor, and the denominator of which is four."  G. L. c. 63,
§ 38 (c), as amended through St. 1996, c. 264, § 2.  The
"property factor," the "payroll factor," and the "sales factor"
referred to in § 38 (c) are separately defined in G. L. c. 63,
§ 38 (d), (e), and (f), respectively.  As set out in the cited
definitional provisions, each of these factors represents a
fraction, in which the numerator is the corporation's total
payroll, or property, or sales, in the Commonwealth; and the
denominator is the corporation's total payroll, or property, or
sales, "everywhere during the taxable year."

c. 63, § 31A, was enacted in 1970, see St. 1970, c. 634, § 2;[15] and the research and development credit (R&D credit) described in G. L. 63, § 38M, was enacted in 1991, see St. 1991, c. 138, § 130.[16]

b.  <u>Section 38 (l)</u>.  The United States Supreme Court "has long upheld, subject to certain restraints, the use of a formula-apportionment method to determine the percentage of a business' income taxable in a given jurisdiction."  <u>Westinghouse Elec. Corp.</u> v. <u>Tully</u>, 466 U.S. 388, 398 (1984).  The Court also has "repeatedly held that a single-factor formula is presumptively valid."  <u>Moorman Mfg. Co.</u> v. <u>Bair</u>, 437 U.S. 267, 273 (1978).  Genentech claims, however, that the single-factor apportionment formula in § 38 (<u>l</u>), as applied to it, rebuts this

---

[15] As defined in G. L. c. 63, § 31A (<u>a</u>), the ITC entitles a manufacturing corporation (among other listed types of corporations) to a credit against the excise tax due under G. L. c. 63 of one per cent of the cost of "qualifying" tangible property -- defined to include tangible personal property and other property including buildings -- "acquired, constructed, reconstructed, or erected during the taxable year" that was "situated in the Commonwealth on the last day of the taxable year" and depreciable under the Internal Revenue Code with a useful life of at least four years.  The ITC may be used in the year the expense is incurred, but unused portions may be carried forward to subsequent tax years.  G. L. c. 63, § 31A (<u>g</u>).

[16] General Laws c. 63, § 38M (<u>a</u>), provides a credit against a corporation's corporate excise tax due under G. L. c. 63 for certain qualifying research expenditures paid during the taxable year, limited to expenditures for research conducted in Massachusetts.  Like the ITC, the R&D credit may be used fully during the year the expenditures were incurred but unused portions may be carried forward.  See G. L. c. 63, § 38M (<u>f</u>).

presumption of validity because it violates the commerce clause test established in the Complete Auto Transit case, 430 U.S. at 279, insofar as the formula is (1) discriminatory in relation to interstate commerce; (2) not fairly apportioned in relation to the extent of Genentech's activities in Massachusetts; and (3) not "fairly related to the services provided by the State."  Id. Genentech's complaint, however, centers virtually entirely on the first Complete Auto Transit test.  In particular, Genentech complains that by requiring the company to use § 38 (l)'s single-factor apportionment formula based only on sales while simultaneously denying it the benefit of the ITC and R&D credit, § 38 (l) discriminates against the company as a foreign corporation whose manufacturing activities take place in a State other than Massachusetts (i.e., California), and therefore unconstitutionally burdens interstate commerce.

The dormant commerce clause "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce."  Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Or., 511 U.S. 93, 98 (1994).[17]

---

[17] See Fulton Corp. v. Faulkner, 516 U.S. 325, 331 (1996), quoting Chemical Waste Mgt., Inc. v. Hunt, 504 U.S. 334, 342 (1992) ("With respect to state taxation, one element of the protocol summarized in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 [1977], treats a law as discriminatory if it "tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State").  See also Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 332 n.12

We disagree with Genentech's claim, based on its reading of the legislative history of § 38 (l), that the statutory change in the excise tax apportionment formula for manufacturers in 1995 was an intentionally discriminatory one, fueled by a purpose to benefit local manufacturers directly at the expense of manufacturers that maintain their manufacturing facilities and operations in other States.  Rather, we read the legislative history of § 38 (l) as indicating that the purpose of the change in the apportionment formula was designed to encourage manufacturers to increase the level of their investment in manufacturing operations in the Commonwealth by removing a tax "disincentive" created by the three-factor formula.[18,19]  The

---

(1977) (noting that State "may not discriminate between transactions on the basis of some interstate element").  State laws discriminating against interstate commerce on their face are "virtually per se invalid."  Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Or., 511 U.S. 93, 98 (1994), and cases cited.

[18] See letter to Senate and House of Representatives from then Governor William F. Weld and then Lieutenant Governor Argeo Paul Cellucci, dated September 5, 1995, enclosing legislative proposal entitled "An Act to promote job growth in the Commonwealth"; memorandum to then Governor William F. Weld and then Lieutenant Governor, Argeo Paul Cellucci, from Gloria Cordes Larson and David B. Keto, "Q&A's on House No. 5617, 'An Act Relative to Job Creation and Economic Expansion in the Commonwealth,'" dated November 21, 1995 (Larson Memorandum); press release, "Weld, Cellucci Sign Single Sales, Limited Liability Bills," dated November 28, 1995.

[19] The "disincentive" that was perceived was that because a three-factor apportionment formula takes a corporation's property and payroll in Massachusetts into account, as well as

Supreme Court has recognized this type of business investment encouragement as a constitutionally appropriate goal. See Trinova Corp. v. Michigan Dep't of Treasury, 498 U.S. 358, 385-386 (1991), quoting Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 336 (1977) ("It is a laudatory goal in the design of a tax system to promote investment that will provide jobs and prosperity to the citizens of the taxing State. States are free to structure their tax systems to encourage the growth and development of interstate commerce and industry" [quotation omitted]).

It is true, as Genentech points out, that when the 1995 change in the apportionment formula for manufacturing corporations from one using an income allocation formula that includes Massachusetts property and payroll to one focusing solely on Massachusetts sales occurred, it may well have caused the amount of income apportioned to Massachusetts to decrease for manufacturing corporations that conducted their manufacturing operations in the Commonwealth, and have had the opposite effect on such corporations, like Genentech, with their

---

its Massachusetts sales, any increase in the company's manufacturing operations in the Commonwealth -- presumably resulting in an increase in the company's Massachusetts-based property and personnel -- would cause an increase in its excise tax apportionment factor and thereby an increase in the portion of its income subject to Massachusetts tax. See Larson Memorandum at 2.

manufacturing facilities elsewhere.[20]  But the dormant commerce clause does not forbid a State from changing the allocation formula it uses to determine what share of the income generated by a multistate corporation operating in the taxing State is fairly subject to tax.  As previously stated (see note 17, supra), what the commerce clause forbids as discriminatory is a State tax measure that "tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely

---

[20] The reason a manufacturing corporation with sales in Massachusetts and other States but with its manufacturing operations significantly located in Massachusetts would benefit from the change in allocation formulas is that the corporation's investment in property and payroll in the Commonwealth become irrelevant as factors influencing the allocation formula.  See note 19, supra.

The reason a manufacturing corporation such as Genentech, with sales in the Commonwealth but manufacturing operations elsewhere would likely experience an increase in the amount of its income apportioned to Massachusetts when the apportionment method changed to a single-factor formula is illustrated by the following example.  Assume a manufacturing corporation had sales in the Commonwealth that amounted to ten per cent of its overall sales, but one hundred per cent of its manufacturing and other property as well as one hundred per cent of its manufacturing employees were located in another State.  Under the three-factor allocation formula in § 38 (c) that previously applied, the corporation's allocation factor would be effectively determined by dividing only twice times its sales factor by four:

$$\frac{0 \text{ property factor} + 0 \text{ payroll factor } (0) + 2(.10 \text{ sales factor})}{4}$$

See note 14, supra.  Under the new allocation formula in § 38 (l), however, at least beginning in 2000 and going forward, this same manufacturing corporation's allocation factor would be the .10 sales factor itself, that is, undivided by 4.

within the State." Chemical Waste Mgt., Inc. v. Hunt, 504 U.S. 334, 342 (1992), quoting Armco Inc. v. Hardesty, 467 U.S. 638, 642, (1984). See Boston Stock Exch., 429 U.S. at 337 (State may not "discriminatorily tax the products manufactured or the business operations performed in any other State"); id. at 332 n.12 (State "may not discriminate between transactions on the basis of some interstate element"). The single-factor apportionment formula prescribed by § 38 (l) does not commit any such sin. It uses the same apportionment formula to tax every multistate manufacturing corporation's income generated from its sales in the Commonwealth, treating every corporation, whether foreign or domestic, exactly the same. More to the point, the formula treats the income from every sales transaction involving manufactured goods exactly the same, no matter where the corporation's manufacturing operations may be located. Compare, e.g., New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 274 (1988) (Ohio fuel tax credit for Ohio-produced fuel unconstitutionally discriminates against products of out-of-State manufacturer in violation of commerce clause); Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 271-272 (1984) (Hawaii tax exemption solely for liquor produced in Hawaii unconstitutionally discriminatory). The single-factor apportionment formula based on sales in § 38 (l), on its face or

as applied to Genentech, does not discriminate against interstate commerce.

Nor does the unavailability of the ITC or the R&D credit to a manufacturing corporation like Genentech, that has chosen to conduct its manufacturing operations and perform research and development activities in a State other than Massachusetts, change this result. It is true that these credits, if available to a manufacturing corporation, are available to reduce the corporation's excise tax burden. But the credits were in existence long before § 38 was amended in 1995 to add § 38 (l) for manufacturing corporations; are available to a variety of corporations in addition to manufacturing corporations; and are clearly designed to encourage companies to locate operations in Massachusetts and thereby invest in the economy of the State. The commissioner points out that many States have adopted similar investment tax and R&D tax credits, including California; the record indicates that Genentech has qualified for and used California's equivalent credits against its California tax burden for many years.[21] The availability of these credits, which are tied to investments of resources in the Commonwealth, are available to any manufacturing corporation, foreign or domestic, and operate independently of the

---

[21] The record also reflects that in one or more of the tax years at issue here, Genentech itself qualified for and used the Massachusetts R&D credit.

corporation's interstate sales or other interstate commercial activities, does not violate the commerce clause.  See New Energy Co. of Ind., 486 U.S. at 278 ("The Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only action of that description in connection with the State's regulation of interstate commerce.  Direct subsidization of domestic industry does not ordinarily run afoul of that prohibition; discriminatory taxation of out-of-state manufacturers does" [emphasis in original]).  See also Fireside Nissan, Inc. v Fanning, 30 F.3d 206, 216 (1st Cir. 1994).

> Decision of the Appellate
> Tax Board affirmed.